[S.F. No. 23639. Oct. 20, 1978.]

HENRY G. SCHERLING, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

494

## COUNSEL

Sheldon Portman, Public Defender, and C. Randall Schneider, Deputy Public Defender for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Dane R. Gillette, Deputy Attorneys General, for Real Party in Interest.

## OPINION

MOSK, J.—On March 9, 1976, the District Attorney of Santa Clara County filed an information charging defendant with four counts of burglary committed in 1966 and 1967.[1] The information also alleged that defendant left California in July 1969 and remained away until February 1976. Defendant moved to dismiss the information on the ground that the

---

[1] For literary convenience we refer to Scherling as the defendant, although in this proceeding he is a petitioner.

court lacked jurisdiction because the three-year statute of limitations applicable to burglary had lapsed[2] and that he had been denied his right to a speedy trial. The trial court, after holding an extensive evidentiary hearing, denied the motion. Defendant seeks a writ of prohibition to restrain the court from proceeding to trial on the information. He contends that section 802 of the Penal Code, which tolls the statute of limitations for the period a defendant is out of the state, is unconstitutional as applied to him, and that he was deprived of his right to a speedy trial.

Defendant was charged in the information with entering the San Jose Peace Center on November 26, 1966, the home of Grace McDonald on January 11, 1967, the residence of Frederick Hirsch in the spring of 1967, and the Palo Alto Peace Center on February 2, 1968, all located in Santa Clara County, with intent to commit a felony. (§ 459.) In each burglary, only files belonging to the victims were taken.

Although these crimes were reported to the Santa Clara police, defendant's involvement was not suspected for many years. However, another law enforcement official, Chief James Ailes of the police department in Delano, Kern County, was aware of some of defendant's illegal activities in Santa Clara because of defendant's participation in a burglary in Delano on May 30, 1967. On that date, defendant and Jerry Ducote unlawfully entered the Philippine Community Center in that community and removed records and files relating to Cesar Chavez and the United Farm Workers. The Delano police traced the car used in the burglary to defendant, who then lived in San Jose.

At the request of the Delano police, defendant was arrested, photographed and fingerprinted by the San Jose police. An officer of the Delano Police Department interviewed defendant at the San Jose Police Department; defendant's attorney was present, but no San Jose police attended. Defendant explained that on the date in question he had driven to Fresno for female companionship, and had picked up a hitchhiker. The Delano officer determined that there were discrepancies between defendant's statement and the police report of the burglary; he attempted unsuccessfully to contact the victims of the Delano burglary, and then turned the file over to Chief Ailes.

---

[2]All references in this opinion are to the Penal Code. Section 800 provides that an information shall be filed for any felony within three years after its commission.

In early June 1967, Ducote and defendant's attorney met with Chief Ailes at the Bakersfield airport. Ducote testified that the purpose of the meeting was to deter the police from continuing the investigation of the Delano burglary. He showed Ailes various documents obtained in the Santa Clara burglaries charged in the first two counts of the information, related the manner in which the documents had been obtained, and implicated defendant in the crimes.

Ducote advised Chief Ailes that he had given the stolen material to an organization called Western Research, which allegedly had close connections with the F.B.I., and that some of the material had gone to the C.I.A. Ducote's purpose was to demonstrate that the burglary in Delano had been committed to obtain subversive material for the use of government agencies so that Ailes would discontinue the investigation. The Delano Police Department took no further action; Ailes testified that the case was dropped because the victims failed to cooperate in the investigation.

In July 1969, defendant lost his job in Santa Clara County and moved with his family to Idaho. He left a forwarding address with the post office, and his telephone number was listed in the directory in Coeur d'Alene. He used his true name at all times.

In 1973 Ducote embarked on a scheme of fraud and deceit in order to obtain money. He used the name of a prominent grower in the Salinas Valley area to obtain loans from private parties.[3] The grower complained to the district attorney, but refused to provide details to the authorities, and the case against Ducote was dropped. Defendant's name was never mentioned in connection with this investigation.

About this time, Ducote, using an alias, contacted the attorney for the United Farm Workers, and offered to sell him the documents stolen from that organization for $25,000. The attorney notified the F.B.I., and advised the agent assigned to the case that at a meeting with Ducote, he was told Ducote had committed 16 political burglaries and had taken documents from the victims. The agent contacted the Santa Clara District Attorney's office, which informed him that Ducote's file contained no information later than October 1969. The agent forwarded all the information in his possession to the United States Department of Justice, and was subsequently notified that there were no federal civil rights

---

[3]Ducote testified that he committed 16 "political" burglaries in various areas of California and in other parts of the country. He stated that a group of named growers and businessmen sponsored and paid the expenses of these operations.

violations involved in Ducote's activities; the agent was directed to contact local authorities concerning the burglaries.

The trial court found that Santa Clara officials had no knowledge of the report of the burglaries until 1976, although there is some conflict in the evidence on that issue. In April 1974, one Jerry Boyes contacted the Santa Clara District Attorney's office and showed an investigator two newspaper articles discussing political burglaries. Boyes stated that Ducote and others were involved in the burglaries, and that he had been present when Ducote displayed the documents taken from the break-ins mentioned in the articles. Defendant's name was not mentioned. The investigator who spoke with Boyes believed he was not a credible witness and did not pursue the information provided. The trial court found that the failure of the county to investigate further was justified.

Boyes also contacted other government agencies, including the intelligence branch of the California Department of Justice, at which he spoke with agent Walter Kubas about Ducote's involvement in political burglaries. Kubas contacted Ducote on February 14, 1975, and Ducote confessed to the burglaries and told of defendant's involvement. He turned over several boxes of documents stolen in the break-ins, and Kubas gave them to the legal staff. But it was not until October 1975 that the legal staff referred the matter to the investigative branch of the department to conduct an investigation for the purpose of prosecution.

On November 4, 1975, an agent of the department contacted Santa Clara County officials about the burglaries. After a preliminary hearing regarding Ducote's involvement in the crimes, investigators from the county and the department flew to Idaho, where they met with defendant on January 4, 1976. On February 2, 1976, defendant came to San Jose from Idaho and was arrested by Santa Clara authorities that day.

Defendant admits that he unlawfully entered the premises described in the information, but claims that he did not intend to permanently deprive the burglary victims of their papers. He claims that Ducote had advised him that the stolen documents were for the use of intelligence agencies, and that he assumed they would be copied and returned to their owners.

I

As we have seen, section 800 provides a three-year statute of limitations for burglary. The offenses charged against defendant occurred in 1967

and 1968, and the information was not filed until February 1976. The statute of limitations would have lapsed, therefore, but for the command of section 802 that if a defendant is out of the state when or after an offense is committed, no time during which he is absent is to be computed as a part of the limitation period. Defendant left California in July 1969, approximately two years and eight months after committing the first offense charged in the information and 17 months after the last offense.

■ He asserts that section 802 should not be applied literally and that an exception to its application should be made where, as here, the accused was not in flight from prosecution at the time he left the state, no warrant for his arrest had been issued either before or after he departed, and state law enforcement officials knew, or in the exercise of reasonable diligence should have known, his whereabouts. In these circumstances, defendant claims, his absence did not prevent the People from bringing him to trial within the three-year limitation period. According to defendant, the purpose of section 802 is to assure state officials access to a person chargeable with crime before the statute of limitations has lapsed, and where, as here, they in fact have such access the tolling of the statute would violate a defendant's right to travel freely and to equal protection of the laws. (U.S. Const., art. IV, § 2, 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)

At the outset, we question defendant's premise that the sole reason for the tolling provision of section 802 is to assure that an accused is available for prosecution at all times prior to the lapse of the statute of limitations. The Legislature could have rationally determined that the likelihood of detection of the crime and identification of the criminal is greater if the accused remains within the jursidiction, and that because the result—even if not the intent—of his departure from the state is to render discovery of the crime or the criminal more difficult, the statute of limitations should be tolled during his absence.

Such a purpose is particularly relevant to the circumstances here. Even if we accept defendant's contention that he was available for prosecution at all times because he lived openly in Idaho and the police could have determined his whereabouts with little effort, this fact would not have significantly advanced the state's ability to prosecute him within the three-year period since the Santa Clara authorities did not suspect defendant's complicity in the burglaries until long after the statute of

limitations had lapsed. It is not unreasonable to find that he would have been a target of suspicion sooner if he had remained in California; thus his purported availability for prosecution is not alone sufficient to fulfill the purpose underlying section 802.

Defendant relies upon cases holding that freedom to travel throughout the United States and to abide in any state are basic constitutional rights. (*United States* v. *Guest* (1966) 383 U.S. 745, 757-759 [16 L.Ed.2d 239, 248-250, 86 S.Ct. 1170]; *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 338 [31 L.Ed.2d 274, 281-282, 92 S.Ct. 995]), and that statutes imposing residence requirements as a condition of receiving government benefits violate these rights (*Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250, 269 [39 L.Ed.2d 306, 321, 94 S.Ct. 1076]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 629-631 [22 L.Ed.2d 600, 612-613, 89 S.Ct. 1322]).

While these cases instruct us on broad principles, there is clearly a distinction between one who, like defendant, leaves the state after committing a crime, resulting in the tolling of the statute of limitations during his absence, and one who has committed no crime but is deprived of a government benefit merely because he exercises his right to travel to another state. In the former circumstance, the state has an interest in assuring that the defendant is available locally not only to enhance the possibility of detection but also to avoid the burdens of extradition proceedings, should he be charged, his whereabouts become known, and he refuses to return voluntarily.

More arguably relevant to defendant's contention is *In re King* (1970) 3 Cal.3d 226 [90 Cal.Rptr. 15, 474 P.2d 983]. That case involved section 270, which provided that nonsupporting fathers who remained out of the state for 30 days were guilty of a felony, whereas such fathers who remained in the state could be charged only with a misdemeanor. We held that increasing the punishment for fathers who left the state was both a denial of equal protection and a violation of the right to travel because it imposed additional criminal liability upon an individual solely because he chose to remain outside the state. The People had maintained that the statute had a valid purpose because it encouraged nonsupporting fathers to remain in California, thereby facilitating the enforcement of support obligations against them, but we determined that such a purpose "lacks constitutional sanction because it violates the individual's constitutional right to choose his own domicile and to travel freely throughout the country." (3 Cal.3d at p. 234.)

The present case is distinguishable from *King* in that here the defendant is not subjected to greater penalty because he left the state; rather, he is faced with a tolled statutory period of limitations. In addition, under section 802 the state has an interest in assuring that one who has committed a crime remain in the jurisdiction to enhance detection of the crime or identification of the criminal; that interest was not involved in section 270 proceedings, since the identity of the nonsupporting father was not in doubt. While *King* holds that it is impermissible to encourage nonsupporting fathers to remain in California in order to facilitate enforcement of their support obligations, it did not declare that an accused's right to travel prevails over the state's interest in detecting crime and identifying criminals. Section 802 does not violate defendant's right to travel.

Defendant also invokes an equal protection contention: that the distinction made in section 802 between an accused who leaves the jurisdiction after committing a crime and one who remains here is invalid where, as in the present case, the accused who departs is available for prosecution. He poses this illustration: one who has committed a crime but who has never left the state is immune from prosecution for burglary after three years even though a warrant has been issued for his arrest, he has assumed a false identity and is hiding within the state, whereas an accused in defendant's position, who lives openly in the state for a period of time after the crime but who, with no avowed intention to avoid detection, exercises his right to travel before the statute of limitations has run, is forever subject to prosecution even though his whereabouts are or could have been known and ultimately he voluntarily returns to the state at the request of the authorities. In this connection, defendant points out that Ducote and others involved in the burglaries are immune from prosecution, whereas he is being held to answer for crimes in which they were the major participants.[4]

■ Defendant asserts that his equal protection claim must be tested by the "strict scrutiny" standard because he is seeking to exercise his constitutional right to travel and because his right to liberty represents a fundamental interest. (*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]; *Cotton* v. *Municipal Court* (1976) 59 Cal.App.3d 601, 605 [130 Cal.Rptr. 876].) We have concluded above that section 802 does not violate defendant's right to travel freely, and we hold likewise that the tolling of the statute of limitations does not deprive him

[4]However, Ducote has pleaded guilty to other crimes which the Attorney General describes as "the fruits of these operations."

of a fundamental interest in liberty. In *Olivas* and *King,* the difference in classification resulted in additional criminal liability imposed upon offenders committing the same crime, and in *Cotton* the statute imposed criminal sanctions upon nonsupporting fathers, but not upon mothers who failed to provide for their children. In the present case, by contrast, the application of section 802 to those who leave the state after committing a crime does not result in a penalty greater than that imposed upon those who remain nor does it discriminate on the basis of sex, but rather subjects the defendants who choose to absent themselves to responsibility for a longer period of time.

Thus, in this instance we measure defendant's equal protection claim by the less rigorous rational relationship standard applicable to rights which are not deemed to be fundamental. As we point out above, the Legislature could have determined that the detection of the crime and identification of the criminal are more likely if the criminal remains in the state than if he departs. This assumption justifies tolling the statute of limitations for the period during which the criminal may have avoided detection by leaving the jurisdiction.

That application of the tolling provision to a defendant who leaves the state may have arguably harsh results in an individual case does not render the statute unconstitutional. Since the classification has a rational relation to a valid governmental interest, we reject defendant's claim that it violates his right to equal protection of the law.

*Zimmerman* v. *Superior Court* (1967) 248 Cal.App.2d 56, 63 [56 Cal.Rptr. 226], does not compel a different result. There, the court refused to apply section 802 to a defendant who was incarcerated in another jurisdiction and had written the Los Angeles district attorney seeking to be brought to trial on charges in California at the earliest possible time. The court held that the limitation period is not tolled if the accused has, within the statutory period, requested that he be brought to trial, and the prosecution has failed to comply with his request. Here, of course, defendant did not take such measures.

II

We turn, then, to defendant's claim that he was deprived of the right to a speedy trial under article I, section 15, of the California Constitution.[5]

---

[5]The section provides, in part, "The defendant in a criminal cause has the right to a speedy public trial . ... ." Defendant concedes on appeal that the right to a speedy trial

We have examined the scope and application of the right to a speedy trial under state and federal law in a number of recent decisions. (See, e.g., *People* v. *Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Bradford* (1976) 17 Cal.3d 8 [130 Cal.Rptr. 129, 549 P.2d 1225]; *Sykes* v. *Superior Court* (1973) 9 Cal.3d 83 [106 Cal.Rptr. 786, 507 P.2d 90]; *People* v. *Archerd* (1970) 3 Cal.3d 615 [91 Cal.Rptr. 397, 477 P.2d 421]; *Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10].) ■ In summary, under California as well as federal law, the right to a speedy trial clearly attaches after an arrest or the filing of an indictment or information. (*United States* v. *Marion, supra,* 404 U.S. 307, 320 [30 L.Ed.2d 468, 478].)

Unlike federal law, however, this state has extended the right to the preindictment and prearrest stage, holding that it attaches under article I, section 15, of our Constitution[6] after a complaint has been filed. (*Jones,* 3 Cal.3d at p. 740; *Hannon,* 19 Cal.3d at p. 608.) But the consequence of a violation depends upon the stage at which a violation of the right occurs. The right to a speedy trial following the filing of an indictment or information and the time limitations applicable thereto are set forth by statute (§ 1382)[7] and a violation of the statute is presumed to be prejudicial. (*Sykes,* 9 Cal.3d at pp. 88-89.) A violation at a prior stage depends upon a balancing of the prejudicial effect of the delay and the justification therefor. (*Jones,* 3 Cal.3d at p. 740; *Bradford,* 17 Cal.3d at pp. 18-19.)[8]

Defendant asks us to carry the progression of our prior decisions one step further, and to hold that the right to a speedy trial arises even prior to the filing of a complaint, and that he may invoke that right if the

---

under the Sixth Amendment to the United States Constitution applies only after his arrest on February 3, 1976. (See *United States* v. *Marion* (1971) 404 U.S. 307, 320 [30 L.Ed.2d 468, 478, 92 S.Ct. 455].)

[6]Article I, section 15, provides, "The defendant in a criminal cause has the right to a speedy public trial. . . ."

[7]Section 1382 provides in pertinent part: "The court, unless good cause to the contrary is shown, must order the action to be dismissed . . . 2. [w]hen a defendant is not brought to trial in a superior court within 60 days after the finding of the indictment or filing of the information. . . ."

[8]We reject defendant's suggestion that we hold a presumption of prejudice arises whenever there is a delay between the commission of a crime and the time a formal charge is filed. Even after a complaint is filed prejudice is not presumed from a delay. To extend the presumption to an even earlier stage would be clearly unwarranted. In *Archerd,* we rejected such a proposal: "Post-indictment delay does not require the showing of prejudice; it is presumed. Such a rule would be unworkable if prejudice were presumed in preindictment delay." (3 Cal.3d at p. 640.)

government either has decided to charge him with an offense or has a reasonable basis for doing so, but delays the arrest. He claims that there was probable cause to arrest him on the first and second counts charged in the information when, in June 1967, Ducote told Ailes about the two burglaries referred to in those counts, and that the authorities had probable cause on the third and fourth counts of the information when Ducote told Kubas in February 1975 about defendant's involvement in the burglaries.

In *Jones* we did not reach the issue raised by defendant because there the delay occurred after a complaint was filed but before the defendant was arrested, and it was necessary to decide only whether the right to a speedy trial applied at that stage of the proceedings. (3 Cal.3d at p. 739.) Our decision in *People* v. *Archerd, supra,* 3 Cal.3d 615, involved circumstances more nearly parallel to the present case. We there held that a delay between the time a crime is committed and the defendant is charged is to be tested not by the rules applicable to speedy trials, but by whether the defendant has been denied due process of law. In *Archerd,* there was an 11-year delay between the first of a series of murders committed by the defendant and the time an indictment was filed against him. The delay was caused by the absence of a scientific test to confirm the suspicion of the police that the defendant had murdered his victims by the injection of insulin. We rejected the claim that the defendant was deprived of a speedy trial and determined that the test to be applied in assessing the delay was whether he had been denied due process of law. We affirmed the conviction, concluding that the defendant had demonstrated neither prejudice nor a delay which was unreasonable or deliberate.

We affirm our determination in *Archerd,* that due process is the appropriate test to be applied to a delay occurring after a crime is committed but before a formal complaint is filed or the defendant is arrested. But regardless of whether defendant's claim is based on a due process analysis or a right to a speedy trial not defined by statute, the test is the same, i.e., any prejudice to the defendant resulting from the delay must be weighed against justification for the delay.[9]

Defendant contends that he was prejudiced by the delay in charging him with the burglaries because his memory of the crimes has

---

[9]In both *Jones* (3 Cal.3d at p. 741, fn. 1) and *Bradford* (17 Cal.3d at pp. 18-19) we observed that whether the claim is characterized as a speedy trial or due process issue, the same balancing approach is utilized.

faded and because a number of witnesses who were available to verify his defense have died or are unavailable. As we have seen, defendant does not deny that he participated in the entries alleged in the information; he asserts, however, that he assumed that the purpose of his activities was to provide information to government agencies regarding left-wing organizations and that the material taken in the burglaries would be copied and returned to the victims. He claims that he told a doctor, his father-in-law and a fellow worker about these assumptions; two of these potential witnesses are deceased and one has moved from the area and her whereabouts are unknown. Without these witnesses, asserts defendant, only his wife, his brother, and Ducote are available as witnesses, and their testimony would not be convincing to a jury because of their relationship to him and because of Ducote's tarnished reputation.

After an extensive hearing the trial court found, however, that defendant was not prejudiced by the delay. It determined that his testimony did not demonstrate any loss of memory, and that he was very specific regarding details which supported his contentions. The court also found that the unavailable witnesses would only have testified to statements made by defendant to them concerning his intent in committing the crimes, and that such evidence is of speculative value because there are other available witnesses who can testify in substance on the same issue. Furthermore, defendant had contacted authorities in Idaho during his residence there and informed them that he had participated in political burglaries in California on behalf of various government agencies, and the reports of such conversations may be considered by the trial court for possible admission into evidence or may be used to refresh any faded recollection.

We cannot say as a matter of law that the trial court erred in concluding defendant was not prejudiced by the delay. The testimony which the unavailable witnesses could have given would have been cumulative. Four witnesses are available to testify to defendant's motivation in participating in the break-ins, and two of them are unrelated to him. As to his own alleged loss of memory, the details of the break-ins themselves are not of crucial significance since he has admitted that they occurred; his primary defense relates to his intent at the time the crimes were committed.

Since we concur in the trial court's conclusion that defendant was not prejudiced by the delay, we need not determine whether the delay was justified, particularly since there was no evidence that the delay in

prosecution was for the purpose of weakening the defense. Parenthetically we note that, although Chief Ailes may have purposefully failed to report his information about the Santa Clara crimes to authorities in that county, such conduct was not for the purpose of prejudicing the defense but, to the contrary, to prevent the prosecution of defendant.[10]

█ We do not intend to imply that only a deliberate delay by the prosecution for the purpose of prejudicing the defense may justify a conclusion that a defendant has been deprived of due process. The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial. If such deprivation results from unjustified delay by the prosecution coupled with prejudice, it makes no difference whether the delay was deliberately designed to disadvantage the defendant, or whether it was caused by negligence of law enforcement agencies or the prosecution. In both situations, the defendant will be denied his right to a fair trial as a result of government conduct. (See *Penney* v. *Superior Court* (1972) 28 Cal.App.3d 941, 950 [105 Cal.Rptr. 162].) Thus, although delay may have been caused only by the negligence of the government, the prejudice suffered by a defendant may be sufficient when balanced against the reasons for the delay to constitute a denial of due process. However, where, as here, there is neither prejudice to the defendant nor a deliberate delay by the prosecution in order to hamper the defense we conclude that the defendant has not been deprived of due process.

We conclude the trial court properly denied the motion to dismiss the information. Therefore the writ of prohibition is denied.

Tobriner, Acting C. J., Clark, J., Richardson, J., Manuel, J., Newman, J., and Taylor, J.,* concurred.

---

[10]The trial court also found that Chief Ailes dropped the case against defendant at the request of Ducote and defendant's attorney. As defendant correctly points out, however, the evidence does not support a finding that the attorney discussed the Santa Clara crimes with Ailes. According to Ducote, the attorney was not present when Ducote showed Chief Ailes the stolen documents from two of the Santa Clara County burglaries.

*Assigned by the Acting Chairperson of the Judicial Council.