[Crim. No. 15698. Fourth Dist., Div. One. June 24, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK G. PRANTIL, Defendant and Appellant.

**COUNSEL**

Douglas Holbrook and Eugene G. Iredale for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jesus Rodriguez, Keith I. Motley and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—Frank G. Prantil appeals from the judgment after a jury convicted him of forgery by uttering or making use of a forged check under Penal Code section 470.[1] ▊ Uttering requires a person *pass* or *offer to pass* a forged instrument with *knowledge* of the forgery and with the *specific intent to defraud*. (*People* v. *Hellman* (1961) 189 Cal.App.2d 777, 778-779 [11 Cal.Rptr. 433].) The jury decided Prantil had the requisite criminal knowledge and intent when on September 4, 1981, he indorsed and deposited a stolen $53,500 check bearing the forged indorsement of Joanna F. McKnight into his trust account. We conclude substantial evidence supports the judgment and reject Prantil's arguments that pretrial delay and trial court errors denied him a fair trial. We affirm the judgment.

---

[1]All statutory references are to the Penal Code unless otherwise specified.

## FACTS

■    Prantil's argument that there is insufficient evidence to support the judgment necessitates our examination of the entire record to determine whether it discloses substantial evidence such that a reasonable trier of fact could find Prantil guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 562 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We state the facts in detail so that we might carefully analyze whether the evidence supporting the judgment is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citation.]" (*Id.*, at p. 576.) In order to fully understand the facts as presented to the jury we believe it is helpful to divide our discussion into two parts separating the events of September 4, 1981, when Prantil passed the forged check from earlier events involving four forged trust deeds. Although Prantil was not charged with any crime pertaining to the trust deeds, evidence of his involvement with the persons who passed those documents was essential to establish the mental elements of the crime with which Prantil was charged, i.e., his knowledge the check was forged and his specific intent to defraud.

### A

At the time of trial Prantil had practiced criminal law for about 20 years. He acted as his own lawyer in this case.

In the early part of 1981 Melvin Goins, one of Prantil's criminal clients, introduced Prantil to Daryl Bell. Prantil testified that in either the latter part of July or August 1981 Bell asked Prantil to represent him on a charge of bank robbery. Prantil quoted an attorney's fee of $10,000. A few weeks later a woman purporting to be Bell's mother or sister telephoned Prantil and asked him to meet her in order to negotiate a $53,500 escrow check from which Prantil would receive his $10,000 fee. Prantil's testimony on where they first met is conflicting. At trial he admitted testifying before the grand jury that he and the woman first went to her bank where they were unable to cash the check. He testified at trial, however, he was only able to remember meeting the woman on September 4, 1981, at his bank, California First Bank, Casa de Oro Branch where he kept his trust account. The woman, a black, introduced herself as Joanna F. McKnight supposedly Bell's mother. She was between 40 and 45 years of age. Prantil accompanied the woman to a teller's window where he explained to teller Pam Vasquez that the woman was the mother of one of his clients and that as a favor he wanted to deposit the $53,500 check which was made payable to "Joanna F. McKnight." McKnight was to be the first indorser of the check and he was to be the second. McKnight signed the check and at Vasquez' request presented a California driver's license (N5705763) and a military I.D. card to

establish her identity. Vasquez did not notice McKnight spelled her name "McKnight." The driver's license seemed to corroborate Vasquez' impression the woman was about 40. At trial a certified copy of the same driver's license showed the correct identity of the licensee as Lois Fern Kerr a white woman. When Vasquez saw the correct license she said the picture bore no resemblance to the person who indorsed the check.

Prantil indorsed the check "Frank G. Prantil, Trust Account." Vasquez' supervisor Julie Stallone initialed the check and informed Prantil there would be a 10-day hold for collection. Neither Prantil nor the woman said anything about the possibility the check was not genuine.

On September 9, 1981, Joan Price, the owner of United Escrow discovered there were three checks missing from her office. She notified her bank the following day. She was informed one of the missing checks had been filled out for $53,500 and had been deposited into Prantil's account. Payment on the check was stopped.

Presumably Goins who had worked for a maintenance company with access to United Escrow had stolen the checks. Price testified the check had been prepared in her office by a thief using her typewriter, her check protector and a simulation of her signature.

The foregoing facts are essentially undisputed. Prantil does not challenge the likelihood the check was probably stolen by Goins, Price's signature was forged, and McKnight's name placed on the check as part of a criminal scheme to obtain funds. His disagreement is with his involvement in what occurred. At trial he steadfastly denied knowing anything about the events leading up to the theft of the check or its forgery. He testified: "The check was put into my trust account for collection. I knew there was going to be a 10-day hold on the check, and I put it in there for two reasons. The first reason is I didn't know if the check was good or not. [¶] Now I was representing Darrell [sic] Bell, and I knew Darrell [sic] Bell had been in trouble before. So I wasn't really vouching for anything that Darrell [sic] Bell had anything to do with. So I didn't know if the check was good or not. So I figured if I put it in my trust account for collection, if the check cleared then everything was fine. If the check didn't clear then no one would be harmed. So I put it into my trust account, not knowing if it was good or not. [¶] I also put it in my trust account for the reason that I was to receive $10,000 out of the $53,500, and the balance was to be returned to Mrs. McKnight. Or, according to her instructions."

B

Evidence of Prantil's connection with four forged trust deeds was admitted as circumstantial evidence showing his knowledge and intent on Septem-

ber 4, 1981, when he negotiated the forged check. Prantil or someone in his office prepared the trust deeds. The upper left hand corner of each of the completed (and forged) trust deeds requested that after recording the trust deed was to be returned to Prantil's office.

Two of the trust deeds encumbered land owned by Mr. and Mrs. Travis Martin. The other trust deeds encumbered an adjoining parcel of land owned by Joanna F. McKnight. The Martin trust deeds dated December 8, 1980 and December 19, 1980, secured debts of $34,000 and $25,000 respectively. American Federal Financial (AFF) was the beneficiary of the $34,000 trust deed recorded December 17, 1980. Goins was the beneficiary of the $25,000 trust deed recorded January 6, 1981. Bell was the beneficiary of both McKnight trust deeds of $55,000 and $80,000 recorded on March 20, 1981, and March 27, 1981 respectively.

Goins and Bell had a simple plan. They forged trust deeds, named themselves or someone acting on their behalf as beneficiary and then sold the trust deeds pocketing the funds. With reference to the AFF trust deed, Goins with the assistance of someone else posing as the Martins fraudulently obtained funds. The record contains insufficient detail to fully explain this transaction and consequently it remains somewhat of a mystery.

The Martins retained Attorney Jon McKinley to remove the cloud on their title caused by the liens of the forged trust deeds. McKinley examined the preliminary title report on his clients' property. That report noted the property was clear except for three trust deeds: the $34,000 AFF trust deed, the $25,000 Goins trust deed and the $55,000 trust deed in which McKnight was trustor and Bell the beneficiary. McKinley assumed the latter trust deed was a wild lien. He later determined the trust deed was on the report because an incorrect legal description included the McKnight property within the Martins' property. Since copies of the trust deeds contained Prantil's name as the person to whom the documents were to be returned McKinley telephoned Prantil on April 14, 1981.

McKinley explained he represented the Martins, whose property was encumbered by three trust deeds which the Martins believed were forged. McKinley asked Prantil about his relationship with Goins and Bell. McKinley cautioned that "if [Prantil] wasn't careful, [Goins and Bell] would implicate him in what they were doing since he was allowing his name to appear on these deeds of trust."

On July 15, 1981, McKinley had a further telephone conversation with Prantil. This time McKinley was irate. He now represented McKnight as well as the Martins and had filed quiet title actions on behalf of both.

McKinley's telephone call to Prantil had been prompted by his conversation with Beam, an employee of Abecon Mortgage. Beam told him Bell had tried to market a trust deed signed by McKnight. In examining title Beam discovered McKinley's quiet title action and advised Bell his trust deed was not marketable. Bell returned and made a further effort to sell the McKnight trust deed. Beam again examined the title records. This time he discovered the McKnight lawsuit had been dismissed. As an extra precaution, however, Beam telephoned McKinley to ask about the dismissal. McKinley was shocked. He had not dismissed the lawsuit. McKinley went to the courthouse where he had filed McKnight's action in order to examine the original documents in the court file. In the file was a request for dismissal bearing McKinley's forged signature. The dismissal had also been filed with the recorder's office.

After giving Prantil this background McKinley advised Prantil that he should "realize what these people were up to in case he had any control that he could explain to them the consequences of forging an attorney's signature to a lawsuit." McKinley pleaded with Prantil "to have these people cease and desist what they were doing."

McKinley said he had sympathy for Mrs. McKnight since she was an elderly black woman about 78 to 80 years old. Her only asset was the property which Goins and Bell had encumbered. McKinley said Goins and Bell "were dealing with [McKnight's property] in such a manner that there was a certain risk that she would lose some interest in her property, and that they should have some compassion for this particular person."

On July 22, 1981, another lawyer telephoned Prantil. Terry Singleton represented Safeco Title Insurance Company with reference to claims which had been filed against Safeco arising from the forged trust deeds. AFF was one of the claimants. Singleton was satisfied Bell and Goins were involved in forging the trust deeds. Prantil responded to Singleton by explaining he had merely drawn up notes for Bell and Goins. Prantil told his clients that Alan Corey was the owner of a trust deed business and might help them sell the trust deeds. When Singleton told Prantil that "it appeared that both Goins and Bell were involved in the scheme to forge trust deeds and sell 'em." Prantil responded he didn't "think he [Goins] has a pot to piss in." Prantil said he had represented Goins in a robbery case and he really believed there was a substantial amount of jewelry taken in the robbery. He thought the notes represented collateral or the sales price for the jewelry.

When asked about the AFF note and trust deed Prantil said Mrs. Martin had problems with her military identification and was unable to cash the check. Goins brought the "Martins" to his office and the proceeds from the

$34,000 trust deed were deposited into his trust account from which he disbursed $10,000 to himself for representing Goins in a criminal case.

Additional facts will be referred to in the course of our opinion.

## DISCUSSION

## I

Prantil argues the evidence does not establish he passed the forged check as true and genuine, *knowing* it was stolen or forged, or that he deposited it with the *intent to defraud.*

We must consider the evidence including the circumstantial evidence which was introduced to establish Prantil's state of mind in the light most favorable to the judgment presuming the existence of every fact the jury could have reasonably deduced from the evidence. (*People* v. *Johnson, supra,* 26 Cal.3d 557, 562.)

Prantil's relationship with Bell and Goins was introduced for the purpose of showing Prantil's knowledge of his clients' forgery scam. Prantil's awareness of what they were doing was an essential link to establish that he had the requisite criminal intent when he negotiated the $53,500 check on September 4, 1981. By that date Prantil should have been sensitized as to what was occurring around him. The evidence permitted a reasonable inference that Prantil was at the core of some remarkably suspicious events. Either he or someone in his office had prepared four documents over a period of almost four months, December 1980 through March 1981, on which the signature of the trustors had been forged. We assume that each of the notes secured by the trust deeds was also forged.

Prantil knew about the forgeries before September 4, 1981, because he had been told on three separate occasions by two lawyers that Goins and Bell had forged the documents. Each lawyer had warned him about the activities of Bell and Goins. Each had cautioned him about his further involvement with his clients. Each emphasized he was placing himself at risk. Prantil was also emphatically told about the unconscionable impact on elderly Mrs. McKnight facing the loss of her only asset. By September 4, 1981, Prantil knew Goins had brought an imposter to his office posing as Mrs. Martin, and knew that he had participated in cashing a $25,532.38 check representing the proceeds of the $34,000 trust deed from which he received a $10,000 fee. The identification used by the "Martin" at that time was a military I.D., the same type of identification used by "McKnight" on September 4, 1981.

Prantil does not deny conversations with McKinley or Singleton. His defense theory was that he was merely negotiating a check into his trust account for collection.

Prantil's testimony borders on the incredible. The jury's rejection of what he had to say was to have been expected. He was asking the jury to ignore all of the evidence except his protestations of innocence. He wanted the jury to forget that he first went with Bell's "mother" to her bank where they could not cash the check. He was also asking the jury to ignore the startling coincidence that Bell's mother had the same name as the woman McKinley described as elderly whose only asset was being taken from her. The jury was also asked to forget about the "Martin" for whom he had negotiated the earlier check from which he had received a $10,000 fee was an imposter who had used the same method of identification as that used by "McKnight" on September 4, 1981. And the jury was also to ignore that Prantil prepared the trust deeds ultimately sold through Prantil's friend Alan Corey, a friend Prantil acknowledged was dishonest.

All this in order to accommodate a client and to receive a $10,000 fee. But the evidence also established that during this period of time there was no criminal charge pending against Bell. The jury could have reasonably inferred that Prantil knew that no charges were pending against Bell and concocted the entire story to explain his willingness to cash a forged check.

The jury was also able to evaluate Prantil's credibility from the content of his answers and the manner of his testimony. Prantil's answers to important questions are combinations of equivocation, confusion and inconsistency. For example, Prantil testified the proceeds from the $25,000 forged trust deed was deposited into his trust account. When asked how much he received from that check he said "I didn't receive anything out of this check." In response to the question of whether he remembered telling Terry Singleton that he may have received as much as $5,000 from that check he said "No. I might have, but I didn't receive anything out of that check. I think the figure was $2,000, but I didn't—my recollection is the only thing I've received was [$]10,000, although I do remember telling Singleton that I might have gotten $2,000 later, but that pertained possibly to restitution that made with reference to one of Mr. Goins cases. I received $10,000. That's it." At his deposition he testified that he thought the most he received was "a couple of thousand dollars": Answer: "Yeah, but until I look I can't tell you. I might be shocked. I might. I don't know. $5,000, I don't know. I'd be surprised, though, if it was more than a couple of grand." From this type of answer the jury could reasonably infer Prantil received a fee from the proceeds of each forged document.

On occasion Prantil's stonewalling reached remarkable heights. When confronted with what appeared to be substantially damaging evidence Prantil would complain that more accurate evidence was contained in his business records. When asked where those records were Prantil invariably had one excuse or another for failing to produce any record at any time which substantiated any of his claims.

Prantil was convicted on a combination of direct and circumstantial evidence. It was for the jury to examine the facts to determine which witnesses were credible and to draw reasonable inferences from the evidence presented at trial. The jury rejected Prantil's arguments. We are convinced the jury's verdict was reasonable based upon ample evidence that established beyond a reasonable doubt that when Prantil negotiated the forged $53,500 check and deposited it into his trust account he did so knowing that he was passing a forged instrument with the specific intent to defraud.

## II

Prantil argues he was denied due process of law because the information charging him with the crime was not filed until April 11, 1983, about 20 months after the police knew of the events of September 4, 1981. He claims this delay prejudiced him. To resolve this issue we must weigh his prejudice, if any, against the justification for the delay. (*Scherling* v. *Superior Court* (1978) 22 Cal.3d 493, 505 [149 Cal.Rptr. 597, 585 P.2d 219].)

Without citation to the record Prantil says: "His memory on the events had faded. There are numerous times during his testimony when he testified that he could not remember. The witness PAM VASQUEZ did not remember the important events concerning the passing of the check. She did not remember who presented the check or whether the appellant asked her to look at the identification of the imposter."

Before trial Prantil unsuccessfully moved to dismiss this case on the same ground presented here. In the papers supporting his motion he states "the passage of time makes memories fade." He says nothing about his inability to recollect the pertinent facts.

We presume that if delay had affected his ability to recall the facts, he would have so stated to the trial court. Having failed to do so earlier we are unable to accept his unsupported statement now.

After independently reviewing the record we are satisfied Vasquez' memory was not dimmed. She directly and forthrightly answered the questions

posed to her. She had a distinct recollection of the events which occurred on September 4, 1981. To the extent she was not totally responsive to certain questions on cross-examination Prantil was benefited rather than prejudiced.

It is also significant to note Prantil's trial court motion to dismiss because of delay did not refer to the destruction or loss of records on which he was later impeached at trial because of his failure to have such records. We conclude impeachment was attributable to the lack of such records not to the preindictment or preinformation delay.

Moreover, the delay in filing the indictment was justified. During the period immediately before the indictment was filed Prantil was representing Goins on a robbery charge which was then appealed. Any investigation of the present case would have involved talking to Prantil about his endorsement of the $53,500 check. The investigating officers correctly decided not to do so to avoid the risk of interfering with Prantil's attorney/client relationship with Goins. The final sentencing in that case was on February 2, 1983. Proceedings before the grand jury were conducted on February 17, 24 and 28, 1983. We, therefore, reject Prantil's contention that he was denied due process of law by the delay in filing the indictment on February 28, 1983.

## III

In three related arguments Prantil contends the court prejudicially erred by admitting irrelevant evidence. He says evidence of the forged Martin trust deeds, the forged McKnight trust deeds, and his relationship with Alan Corey was irrelevant. (See especially Evid. Code, § 1101, subd. (a).) Even if relevant, he contends the court should have exercised its discretion under Evidence Code section 352 and excluded the evidence since its prejudicial effect outweighed its probative value. Underlying Prantil's argument is his assumption that his involvement with Goins and Bell interfered with the jury's objective evaluation of the facts in his case. In other words he believes the jury found him guilty by association.

To the contrary, however, Prantil's involvement with Bell and Goins was necessary to establish the essential elements of the crime with which he was charged. The key issue in the case was whether Prantil knew the check was forged when he attempted to pass it. As we have previously noted, it is evidence regarding his ongoing relationship with Goins and Bell—most particularly information he learned in the phone calls from Attorneys McKinley and Singleton—which circumstantially demonstrates Prantil must have known the check was forged. Because a defendant's state of mind is almost

always proved by circumstantial evidence, a sanitized version of the case limited to Prantil's depositing a check into his trust account would have been an exercise in futility from the standpoint of the prosecutor. (See *People* v. *Garcia* (1981) 115 Cal.App.3d 85, 107 [171 Cal.Rptr. 169].) The evidence was relevant; its probative value outweighed its prejudicial effect; and its admission is consistent with Evidence Code section 1101, subdivision (b).

Prantil also contends the court prejudicially erred by admitting his testimony pertaining to his trust account records and allowing evidence to be introduced on his failure to produce those records for his deposition in October 1981 in response to a subpoena duces tecum obtained by Singleton. Prantil fails to acknowledge the nexus between the stolen check which he indorsed and his involvement with the checks representing the proceeds from the Martin forged trust deeds. Even though Prantil was not charged with forging any of the trust deeds he was nonetheless an active participant in preparing those documents and in cashing checks representing the proceeds from at least two of the forgeries. He had received a $10,000 fee from one forged trust deed and an additional fee of either $2,000 or $5,000 from another. The jury was entitled to consider all this evidence in evaluating Prantil's guilt. To suggest the circumstances of Prantil's involvement are suspicious is an understatement. Added to this evidence is the further fact that Prantil had no record authorizing the disbursement of fees to himself on either of the earlier occasions. The absence of written authorization was particularly significant because the jury had been told that a lawyer was required to maintain careful records on the deposit and disbursement of trust account funds. All the evidence was properly received. There was no evidentiary error.

## IV

Prantil argues the court also prejudicially erred in instructing the jury.

### A

■ The court gave the following instruction on uttering: "Now, in order to prove the commission of such crime [uttering], each of the following elements must be proved, each of them. Here we go.

"Number one, that a person passed or offered to pass a forged instrument. That is the first one.

"Two that such person knew that the instrument was forged; and three, that such person passed or offered to pass such instrument with the specific intent to defraud another person or persons."

Prantil correctly says this instruction omits the requirement that the defendant intend to pass the forged instrument as "true and genuine." Instructional error, however, must be considered in light of all of the instructions. The jury was also told: "The defendant is charged in the information with the commission of the crime of forgery, which is a violation of Section 470 of the Penal Code.

"Now, every person with the specific intent to defraud—now, remember that I told you 'specific intent.' That's it. That's specific intent—with the specific intent to defraud another, utters, publishes, passes or attempts or offers to pass or make use—there's a lot of things here—or make use of, *as true and genuine,* any false, altered, forged or counterfeited instrument or document, knowing the same to be false, altered, forged or counterfeited, is guilty of the crime of forgery."

Thus, the jury was properly instructed on the elements of forgery. Moreover, we must also consider the relationship between "intent to defraud" and "passing a check as true and genuine." The jury's finding of "intent to defraud" is necessarily based on its conclusion Prantil passed the check "as true and genuine." Unless the jury had so decided it could not have found Prantil acted with "intent to defraud." Under these circumstances the court's oversight in failing to repeat the element of "true and genuine" is harmless.

B

Prantil asserts the court erred in giving CALJIC Nos. 3.00 and 3.01 on aiding and abetting because there was no evidence that anyone else was involved in the crime. We agree. There was only fleeting reference to the possibility that Bell's "mother" was the principal and Prantil the aider and abettor. The case was tried on the theory that Prantil was the principal.

In closing argument the prosecutor did not mention aiding and abetting. In his closing argument Prantil first said aiding and abetting was not a reasonable choice for the jury. He referred to the court's earlier illustration that the person who actually robbed the store was the principal while the driver of the getaway car was the aider and abettor. Prantil argued: "Now, in this case there were two people at the bank. There was the Defendant and there was this lady with him, this black lady. . . . But the principal of the crime is the Defendant. He is the one that passed the check. He cannot be the aider and abettor. He's the person that goes in and robs the store. He's charged with passing the check. The other lady is not the one that passed the check. She assisted him. She's the aider and abettor.

"So the instruction doesn't apply. He is the principal. He is either guilty of the crime based upon his actions, not on mere knowledge and being present. . . . [T]he Defendant in this case is not the aider and the abettor. He is the principal. He is the one that's charged with uttering or passing, and he's the one that put it in his account. He's the principal.

"So, don't let the District Attorney get up here and argue differently, that he's an aider and abettor. He is not an aider and abettor."

In rebuttal the prosecutor argued: "Mr. Prantil, discussed the concept of principals, indicated that the instructions regarding aiding and abetting are not applicable.

"I think that his concession in argument is somewhat more than he was willing to do when he was on the witness stand.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"If Mr. Prantil uttered it directly, he certainly is a principal rather than aiding and abettor [*sic*]."

Prantil's testimony stressed his lack of knowledge that the check was forged. Consequently, he did not have criminal intent. He repeated this point to the jury in argument. Under these circumstances there was no need for the court to give an instruction on aiding and abetting.

After oral argument Prantil's new appellate counsel submitted a supplemental brief in which he argues the giving of the aiding and abetting instruction violated the holding of *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318] by failing to accurately instruct the jury on the requirements of specific intent for an aider and abettor. ■ *Beeman* requires that the instruction on aiding and abetting include language that the person charged with the crime can only be convicted where the jury finds he acted with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging or facilitating the offense and (3) aided, promoted, encouraged or instigated the commission of the crime. (*Id.*, at p. 561.) ■ The standard aiding and abetting instruction given in the present case required only that the defendant, "with knowledge of the unlawful purpose of the perpetrator of the crime [aided], . . . the commission of such crime."

The asserted *Beeman* error thus compounds our problem. We are faced with a situation in which the trial court erroneously (i.e., unnecessarily) gave an erroneous instruction.

Under usual circumstances, such a problem would be easily resolvable. Numerous California cases have considered similar situations in which a

trial court gave an erroneous instruction which was not warranted by the evidence. These cases routinely conclude that the error was not prejudicial because the irrelevancy of the erroneous instruction was obvious and because there was little likelihood the jury was misled or confused. (See *People* v. *Fain* (1969) 70 Cal.2d 588, 596-597 [75 Cal.Rptr. 633, 451 P.2d 65]; *People* v. *Froom* (1980) 108 Cal.App.3d 820, 829-830 [166 Cal.Rptr. 786]; *People* v. *Lancaster* (1957) 148 Cal.App.2d 187, 197 [306 P.2d 626]; see also *Mehollin* v. *Ysuchiyama* (1938) 11 Cal.2d 53, 57 [77 P.2d 855]; cf. *People* v. *Hairgrove* (1971) 18 Cal.App.3d 606, 608-609 [96 Cal.Rptr. 142].) This conclusion, however, normally relies on an unarticulated standard of prejudice, presumably that enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. None of the cases distinguish between a test of prejudice applied to an error in the *substance* of the instruction, and that applied to an error in *giving* the instruction.

■ That issue is presented to us in the present case because this court has held that a per se reversal standard—with limited exceptions (see *People* v. *Garcia* (1984) 36 Cal.3d 539, 554-556 [205 Cal.Rptr. 265, 684 P.2d 826]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 146-147 [207 Cal.Rptr. 800, 689 P.2d 430]—applies to *Beeman* error. (*People* v. *Acero* (1984) 161 Cal.App.3d 217, 228 [208 Cal.Rptr. 565].) ■ We must thus determine whether that same per se standard applies when an erroneous *Beeman* instruction is erroneously given, that is, where *any* instruction on aiding and abetting is not warranted by the evidence.

Article VI, section 13 of the California Constitution provides that "[n]o judgment shall be set aside . . . on the ground of misdirection of the jury . . . unless . . . the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." ■ This section has been interpreted to prohibit a reversal of a conviction unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) *People* v. *Garcia, supra,* 36 Cal.3d 539, on which this court relied in *Acero,* implicitly recognizes that the *Watson* test of prejudicial error applies in the absence of a federal constitutional issue requiring the application of a stricter standard. (*Id.,* at p. 549.) ■ In *Garcia,* the California Supreme Court relied on a series of United States Supreme Court cases which have reaffirmed the proposition that a criminal defendant has a due process right to have every element of the charged crime proved beyond a reasonable doubt. (*Id.,* at pp. 550-551.) Extrapolating from the high court's split decision in *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], *Garcia* holds that a general rule of per se reversal is required whenever an instruction erroneously " 'removes an

issue completely from the jury's consideration' . . . ." (36 Cal.3d at p. 553.)

*Garcia* recognizes four exceptions to the per se reversal rule. The fourth exception—the so-called *Cantrell-Thornton* exception—derives from California's experience with a per se reversal rule similar to that suggested in *Connecticut* v. *Johnson.* (See *People* v. *Modesto* (1963) 59 Cal.2d 722, 730-731 [31 Cal.Rptr. 225, 382 P.2d 33].) *Modesto* arose in the context of the trial court's failure to instruct on a lesser included offense, which thereby deprived the defendant of his "constitutional right to have the jury determine every material issue presented by the evidence." (*Id.*, at p. 730.) In *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256], the court clarified the *Modesto* rule, making explicit that the trial court's obligation to instruct does not extend to "issues and questions not raised by the evidence."[2] (*Id.*, at p. 685.)

In *Cantrell*, of course, the court did not deal with a substantively erroneous instruction but rather with the failure to instruct. In *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], however, the jury was instructed on the asportation element of kidnaping pursuant to a standard instruction later condemned by the court in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677]. *Thornton* concluded that the erroneous instruction did not prejudice defendant because there was "no evidence deserving of consideration" which would have related to a corrected post-*Daniels* instruction. (11 Cal.3d at p. 769, fn. 20.) In other words, the evidence demonstrated "that defendant's acts constituted section 209 kidnaping under *Daniels* . . . and that there [was] no evidence worthy of consideration to the contrary."[3] (*Ibid.; People* v. *Garcia, supra,* 36 Cal.3d at p. 556.)

We recognize that *Thornton* is not on all fours with the present case. The defendant there could not very well have contended the trial court should have given *no instruction* on the element of asportation. Nonetheless, the Supreme Court's action in *Thornton* is arguably more invasive of the jury's province than an affirmance would be in the present case. In *Thornton,* one

---

[2]It is consistent with this principle that we hold here the issue of Prantil's aiding and abetting a violation of section 470 was not raised by the evidence. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].) Thus, any instruction on the subject should have been avoided.

[3]It is interesting to note that *Thornton*'s footnote discussion of this issue relied on in *Garcia* distinguishes between a failure to instruct, which gave rise to the *Modesto* rule, and erroneous instructions, which *Thornton* indicates are subject to a *Watson* prejudicial error test. (11 Cal.3d at p. 769, fn. 20.) We do not read *Garcia*'s approving discussion of *Thornton* to extend to this asserted distinction. If it did, it would be a simple matter to reject Prantil's contention of error relying on a traditional *Watson* analysis. (See *ante,* pp. 607-608.)

could fairly characterize the court as having directed a verdict against the defendant on the issue of asportation. (Cf. *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 523 [61 L.Ed.2d 39, 50, 99 S.Ct. 2450]; *Connecticut* v. *Johnson, supra,* 460 U.S. at p. 84 [74 L.Ed.2d at p. 832].) In the present case, however, we need not review the strength of the evidence of Prantil's intent or lack thereof in order to conclude the erroneous instruction was harmless because the jury undoubtedly realized it was inapplicable to the case. This conclusion derives not only from the obvious inapplicability of the instruction but also from the fact that this inapplicability was highlighted by Prantil in his closing argument and not contested by the prosecutor. In our view, an amalgam of the principles relied on in *Cantrell* and *Thornton* establish that a rule of per se reversal for instructional error does not apply to situations in which an erroneous instruction was given but where the evidence was insufficient to support the giving of such instruction. Under such circumstances, the key question is whether the giving of the inapplicable instruction was likely to mislead the jury. (*Mehollin* v. *Ysuchiyama, supra,* 11 Cal.2d at p. 57; *People* v. *Lancaster, supra,* 148 Cal.App.2d at p. 197.) The likelihood of jury confusion should be evaluated under the traditional *Watson* standard. In the present case, we do not believe it probable a different result would have been reached in the absence of the erroneous aiding and abetting instruction. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### C

■ Prantil's supplemental brief raised the additional issue of prosecutorial misconduct. During Prantil's argument the prosecutor interrupted:

"MR. PRANTIL: [During argument] [y]ou've got to be stupid. You're not going to do something that ain't gonna get accomplished, ladies and gentlemen. Mr. Prantil's not stupid. He's not going to put it in a 10-day hold. When the check comes and finds out it's stolen, what does he say: Nothing to hide. Go ahead and give it to him. Even though he had a right to hold on to that check an[d] destroy the evidence, if he wanted to.

"Another thing here to consider. Do you think Mr. Prantil would risk 20 years of law practice for a $10,000—

"MR. SULLIVAN: Your Honor, I'm going to object to that. I've got evidence that I could have put on.

"MR. PRANTIL: Oh, bull.

"MR. SULLIVAN: This was not addressed—

"THE COURT: Better approach the bench . . . ."

Outside the presence of the jury the prosecutor said that had the value of Prantil's practice been introduced he would have put on two rebuttal witnesses. That evidence would have included a tape-recorded telephone conversation in which Prantil said, "I'm not going to go in jail. The worst that's going to happen to me is I'll be discharged [*sic*]. That will take years and in the meantime I'll be the meanest fucking son of a bitch in California. And I'll make a ton of money." The prosecutor stated this information had been given to appellant in discovery in federal court. The prosecutor unsuccessfully moved to reopen cross-examination on this issue. The court admonished the jury. Prantil made no objection.

The foregoing events considered in light of Prantil's failure to object cannot be classified as prosecutorial misconduct.

V

During Prantil's cross-examination he was asked a number of questions concerning Alan Corey. Prantil's objections to this line of questioning were overruled. The purpose of the question was to show a further connection between Prantil and Goins and Bell. Prantil's knowledge of Corey's dishonesty and Prantil's opinion of Corey as a con-man was further evidence that he knew Goins and Bell were forging trust deeds prior to September 4, 1981, when he negotiated the forged check. Prantil argues the following question was prejudicial: "Mr. Prantil can you remember coming into my office in March of 1980 discussing Mr. Corey at that time when I had discussions with you as to whether he was a doctor and whether he had a Ph.D. from either UCLA or USC; do you remember that?" The prosecutor also asked whether Prantil knew Corey was a pathological liar.

Although this line of questioning created a difficult problem because the prosecutor became the only person who could corroborate the implied truth of the matters contained in the questions it was nonetheless unavoidable.

Prantil's credibility was a key issue. The questioning of his opinion of Corey was proper because it tended to show Prantil's knowledge of the fraudulent nature of any transaction involving his client Bell. The purpose of the questioning was not to inflame or prejudice the jury but rather to put Bell's relationship with Prantil in the proper light. It established that even Prantil believed Corey was unsavory. While there are problems associated with this type of questioning because of the prosecutor's personal involvement, these difficulties are only to be expected when a lawyer-defendant

talks to a prosecutor about the facts of a pending criminal case and then represents himself at trial.

## VI

■ Goins was shown to be the person who had a key to the escrow company from which the forged $53,500 check was stolen. Prantil unsuccessfully moved for a new trial based in part on what he claimed was newly discovered evidence. Goins was in Chino during the trial and unavailable. Goins refused to testify at the new trial motion because his testimony would incriminate him. Prantil's request for judicial use immunity was denied. It is this unsuccessful effort to obtain use immunity that Prantil says deprived him of his constitutional rights under the Fifth and Sixth Amendments of the United States Constitution.

Prantil admits there is no California case supporting his position. This is not an appropriate case to plow new legal ground since we are unable to discern how significant exculpatory evidence was excluded by the court's ruling.

Prantil says Goins would testify that he and Bell set up Prantil. Goins would also testify Prantil was unaware the check was stolen and Bell lied to Prantil when he said he was subject to a pending criminal charge. If the court correctly evaluated Goins' credibility, Prantil was better off without him. The court said: ". . . I look at a trial, and if I were in your shoes, I would just put as much distance as I could between myself and Goins. He is a—he is an incredible witness. The District Attorney would have loved to have Goins come in here because he would have linked you to him in two seconds to the jury. It would have been worse for you, I think."

At trial the issue was not whether Goins stole and forged the check. It was whether Prantil knew the check was forged at the time he presented it and whether he presented it with the intent to defraud. The proposed testimony from an admitted forger adds little, if anything, to this issue.

Goins' testimony would also not have diminished the impact of the testimony from McKinley and Singleton. The jury decided Prantil was not a credible witness. From our perspective Goins' testimony would only have reinforced that decision.

## VII

When we started this case we were concerned that Prantil was correct in asserting his conviction would create havoc in the practice of law. Precedent

would be established that every attorney who indorsed a third party check for deposit into his or her trust account would be guilty of forgery when the check was either forged or stolen. This is nonsense. What Prantil did in this case bears no resemblance to what lawyers do when they routinely accept and indorse checks into their trust accounts. Accurate records are maintained. Written authorization is received so that specific sums can be paid to designated payees. A jury determined Prantil was guilty of forgery on substantial evidence in a fair trial. At the new trial motion the court independently reweighed that evidence drawing the same inferences reached by the jury. We do likewise.

### DISPOSITION

Judgment affirmed.

Lewis, J., and Lester, J.,* concurred.

A petition for a rehearing was denied July 11, 1985, and appellant's petition for review by the Supreme Court was denied October 3, 1985.

---

*Assigned by the Chairperson of the Judicial Council.