Filed 6/28/13  P. v. Jordan CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOYCE JORDAN,<br><br>     Defendant and Appellant. | A131158, A132602<br><br>(San Mateo County<br>Super. Ct. No. SC062498A) |

Defendant Joyce Jordan appeals a judgment entered upon a jury verdict finding her guilty of driving under the influence resulting in bodily injury.  (Veh. Code, § 23153, subd. (a).)  She contends the trial court erred in denying her motions to dismiss the case based on precomplaint delay and interference with her right to counsel and her motion for new trial, and that the court committed instructional error.  We shall affirm the judgment.

## I.  BACKGROUND

### A.  The Accident

Defendant was driving her minivan in Mountain View at about 7:00 p.m. in December 2004.  A witness, Dean Larwood, saw the van back out of a driveway and miss a parked car by inches.  He followed the van and saw it "weaving back and forth and just obviously out of control."  After a couple of minutes, he called 911 to report what he believed to be a drunk driver.  He followed the van onto the freeway, and continued talking to 911, because the van was "obviously . . . an incredible danger."  The van drifted right and left constantly, and its speed on the freeway varied from about 40 miles an hour to about 75 miles an hour.  The van often drifted on to the shoulder or into the

1

next lane, and narrowly avoided accidents several dozen times. At almost every exit, defendant would use her turn signal as if she were going to exit and would begin to exit, but would return to the freeway at the last moment, crossing the double yellow lines each time.

After 20 or 25 miles, the van hit a car parked on the shoulder, tipping it onto its side. It hit the car directly from behind, travelling at a speed of 50 to 60 miles an hour, and did not brake before the impact. Two cars had been parked along the shoulder. They were not blocking the freeway. Larwood stopped, and saw a man lying on the ground, badly injured. A man was in the driver's seat of the car that had been hit, also injured. From the waist down, he was pinned underneath the car.

Salvador Ruiz Hernandez was driving on Interstate Highway 280 that evening. His car's battery stopped working, and he stopped by the side of the freeway. He called a friend for help, and David Palacios came to help him. Hernandez was in the driver's seat of his car as Palacios was standing at the front of the car, putting the cables together. Defendant's van struck his car. Both Hernandez and Palacios suffered serious injuries, spent weeks in the hospital, underwent surgery, had to spend time in wheelchairs before being able to walk again, still found walking difficult at the time they testified almost six years later, and had been unable to return to their previous employment.

Officer Gary Paul of the California Highway Patrol came to the scene shortly after the accident. Within 15 minutes of arriving, he spoke with defendant, who was in the van. Defendant appeared lethargic, and Paul noticed her eyes were watery; he noted, however, that she had just been hit in the face by an airbag. He asked if defendant had had anything to drink, and she told him she did not drink. He asked if she had taken any medication or drugs, and she said she had taken Prozac and butalbital at about 2:00 p.m., and nortriptyline, trazodone, and Depakote at 6:30 p.m., about an hour and a half previously. In response to Paul's questions, defendant said she was not sick, that she had no physical impairments, that she had last slept the previous night, that she had eaten around 5:00 p.m., that she had started driving in Mountain View, that she was going to South San Francisco, and that she was stopped on highway 280. She said she was under

2

a doctor's care, but could not give the doctor's name. Paul asked defendant if she had been told she could drive when using her medications, and she said, "Sure." She said she did not feel the effects of medications or drugs. Defendant answered Paul's questions coherently. Because defendant was injured, Paul did not perform the standard field coordination tests.

Paul asked defendant how the collision had happened. She said she had been driving at about 65 miles an hour on the freeway, but did not know what lane she was in. She said she had seen bright lights ahead, noticed there was a vehicle in the road, applied the brakes to avoid the vehicle, and collided with it.

In a deposition taken in a civil action Hernandez filed against her, defendant said she had flu the day of the accident; she was clammy and achy, had a headache, nausea, and a runny nose, and was coughing and sneezing. Immediately before the collision, she was traveling in the middle lane and then the fast lane of the freeway, traveling at about 65 miles an hour. She was not feeling well, and was coughing and blowing her nose, and "the next thing I knew I saw the lights and I was—I was hit." She had not noticed the car on the shoulder of the highway. She did not know how she got from the fast lane to the shoulder of the road. She had not had any difficulties driving the van, and did not recall swerving as she drove. After the accident, she was in pain from having hit her head and knees and was "in a complete daze." She did not notice any other injured people in the area.

## B. Defendant's Medications

Defendant's psychiatrist testified that at the time of the accident, he was prescribing Depakote (or valproic acid) for defendant's depression. The medication was to be taken in the evening because it had side effects of tiredness or sedation. Two of the other medications he prescribed for defendant—nortriptyline and trazodone—were to be taken at bedtime for the same reason. He normally explained these side effects to patients, and the Kaiser pharmacy would also explain a drug's potential side effects. The psychiatrist also prescribed Wellbutrin, which could cause insomnia and should be taken in the morning and afternoon. He testified that no matter what time of day defendant

3

took the drugs, they would remain in her blood over an entire 24-hour period, although the amount would decrease over time. He never told defendant that she could not drive the day after taking the sedative medications.

Defendant's internist testified that he prescribed butalbital, a barbiturate derivative, for her headaches, at a dosage of several pills a day. The drug was potentially sedating, and it was standard to have a pharmacy warning about driving or operating heavy machinery while using it. He also prescribed codeine, a narcotic to be taken with the butalbital. He had a routine of discussing the effects of codeine when he prescribed it, including potential drowsiness and clumsiness, rather than relying on the pharmacy to do so. Peak drowsiness would occur within an hour or two of ingestion of the butalbital and codeine, and the medicine could be "pretty well gone" after about four hours. He had prescribed diazepam (or benzodiazepine), a tranquilizer, and thought defendant would have been taking it in December 2004. The diazepam label would have carried warnings that it caused drowsiness and the user should not operate machinery. He told defendant to take diazepam mainly in the evening. He had not prescribed morphine for defendant.[1]

In her deposition, defendant testified she had taken Prozac on the morning of the accident. She had taken two pills of Wellbutrin in the morning and two later in the afternoon. She had last taken trazodone and diazepam the night before the accident. She had taken butalbital and Tylenol with codeine in the morning. She had also taken a cold medication, "either DayQuil or Sudafed or one of those." She felt sick and "worn out" when she was driving immediately before the accident. She denied that her doctors had told her the medications could have adverse side effects or that she should alter her activities when using them, and did not recall any warning labels. She did not believe her medications contributed to the accident or that they impaired her ability to drive.

------

[1] Nortriptyline and diazepam were not found in defendant's blood after the accident.

## C. The Blood Analysis

At 9:45 p.m. the same evening, a phlebotomist drew two vials of defendant's blood. The vials had a capacity of ten milliliters, although they often contained somewhat less, around five to eight milliliters.

In December 2004, Nicholas Stumbaugh, a criminalist who worked for the San Mateo County Sheriff's Office forensic laboratory, removed approximately one milliliter from one of the vials, tested it for alcohol, and found none. He returned the vials to "property," apparently a department that refrigerated and stored blood samples. The San Mateo County laboratory did not test blood for drugs other than alcohol, instead sending samples in such cases to the Santa Clara County crime lab. Stumbaugh understood that the second vial was ordinarily kept for testing by a defendant in a criminal case.

Trevor Gillis, a criminalist at the Santa Clara County Crime Laboratory, analyzed a portion of defendant's blood sample in February 2005, and found "free" codeine at a concentration of .348 milligrams per liter. He explained that when opiates, such as codeine, enter the system, a percentage of the opiate "link[s] up with proteins in the body," or becomes "bound," and has "minimal effect in most cases." A percentage is "free." He found morphine three glucuronide, or bound morphine, at a concentration of 17 nanograms per milliliter. He did not test for any antidepressants, but sent a portion of the sample to an outside laboratory to be analyzed for trazodone. The outside laboratory reported that trazodone was not detected in the sample. The remaining sample was returned to the San Mateo County Crime Laboratory in February 2005.

Bill Posey, a toxicologist at Central Valley Toxicology, tested a sample of defendant's blood in February 2006. He found butalbital at 0.4 milligrams per liter, which was below the effective level, indicating it had been consumed recently but metabolized to the point it was probably not causing an effect on its own, although it could be causing an effect in interaction with other drugs. He found codeine at 0.84 milligrams per liter, which fell in the potentially toxic range—that is, a level that could cause adverse reactions such as becoming overly sleepy or disoriented. He found morphine at a concentration of 0.02 milligrams, which was within the effective range for

that drug; lamotrigine at 0.76 milligrams, which was below the effective level; trazodone at 0.08 milligrams per liter, below the effective level, and valproic acid at 1.2 milligrams per liter, below the effective level.[2]

To test for codeine, Posey used a method known as mass-spectro-analysis, which tests for the total codeine in a sample, both free and bound, rather than only for free codeine. Posey explained that the bound portion of codeine is "bound by proteins. And by making it bigger, that makes it unavailable for access through the spinal fluid and eventually the brain, which is the target site for the drug. So the free form can get into the brain whereas the bound form remains in the blood and can't access the brain." Thus, the free form of codeine, rather than the bound form, affects a person and may cause impairment. The effective range for codeine was 0.1 to .25 milligrams per liter, and the potentially toxic range was .3 to 1.0 milligrams per liter. The level of codeine in defendant's blood—whether the total amount as measured by Posey or the amount of free codeine as measured by Gillis—fell within the potentially toxic range.

Posey explained that codeine has a half-life—that is, the amount of time it takes for the body to remove half of what is present in the blood—of about four to six hours. Butalbital has a half life of eight to twelve hours, and trazodone of twelve to twenty-four hours. He was not aware of any study or literature showing that the small levels of the drugs other than codeine or morphine in defendant's blood would have any interactive effect. He also explained that morphine is a metabolite of codeine; that is, when a person takes codeine, a small portion of it, usually about ten percent, is converted into morphine. The amount of morphine in defendant's blood was lower than that, which could have been because she took the codeine recently or "may be unique to the individual's metabolite." Because the morphine in defendant's blood was bound, however, it was not likely to cause an effect; the effect on her would have been from the codeine itself.

Posey also explained that a person who had used a drug like codeine for a number of years for pain might not experience either the pain-relieving or the narcotic effects as

---

[2] The blood remaining after it was tested was destroyed.

strongly, and might need a stronger dose for those effects to occur.  Driving patterns along with field sobriety testing could determine how the individual was reacting to a medication.

Dr. James Missett testified as an expert on codeine, its effects on the body, and its interactions with other drugs.  He opined that codeine could affect a person's ability to operate a car safely.  He explained that codeine was a narcotic, and that narcotics can slow a person's thinking, make a person sleepier or less responsive, and slow reaction time.  After taking codeine, someone who was driving could think and respond more slowly, and find it harder to maintain constant speed, to drive in a straight line or within boundaries, and to judge speed and distance.  This could occur even when the amount of codeine was within the effective level, and had not reached the potentially toxic level.  He testified that a warning about the effects of codeine, telling the user to exercise caution when driving or operating machinery, is always included on the label when codeine is prescribed.

Dr. Missett testified that codeine is metabolized, or broken down, in the liver.  About five or ten percent is broken down into morphine.  Sixty or seventy percent of the remaining codeine becomes "conjugated," or attached to glucuronide.  The rest remains as "free" codeine.

Based on his review of the transcript of the 911 call, the laboratory results, and defendant's deposition transcript, Dr. Missett believed that the codeine defendant had taken was "overwhelmingly the main culprit" or cause of her impaired driving, in combination with the other sleep-inducing drugs she had in her system; that her coordination, motor skills, and judgment were impaired; and that the impairment affected her ability to drive a car safely.  Dr. Missett acknowledged that a person could build up tolerance to a drug over time, and as a result be unimpaired by an amount that would cause impairment in someone not accustomed to the drug.  However, the description of defendant's erratic driving indicated that at the time of the accident, defendant was in fact impaired.  He also testified that the codeine in defendant's blood was in the "toxic range," and that the amount of codeine suggested she had taken more medications that

7

day than she had testified she took. He did not believe coughing or sneezing alone would explain defendant's driving pattern.

### D. Defense Case

A paramedic who tended to defendant after the accident noted that she was alert and oriented, did not have an altered level of consciousness, and had normal eye movement, verbal response, and motor function. On the ambulance ride, she did not "nod out or become dizzy or weird." He observed her pupils and did not find they were either dilated or constricted. They were of equal size and reactive to light. He did not note anything that would indicate defendant was under the influence of a narcotic analgesic.

Defendant testified in her own defense. She testified she had suffered from migraine headaches her whole life, and for the last 20 or 25 years had been receiving medication for her migraines, including butalbital and codeine with acetaminophen. She had taken her medications consistently over that time. She had been diagnosed with depression in about 1996, had been taking medications for depression, and had been told those medications would help her migraines. The morning of the accident, she had a bad headache and took butalbital and codeine at around 8:00 or 8:30 a.m. She also took Prozac and Wellbutrin in the morning, Wellbutrin again in the afternoon, and a cold medication, either Sudafed or DayQuil, because she had flulike symptoms. She had taken trazodone, valproic acid, and another drug, lamotrigine,[3] the previous evening. These medications were not unusual for her, and she had never become drowsy to the point that she could not drive safely. She had never been warned not to drive when taking these drugs except codeine. She had been told she should not drive immediately after taking codeine, and said that Dr. Witt and the pharmacy had probably warned her "in the beginning" that codeine could make her drowsy. She had also noticed that her prescriptions for codeine and butalbital had labels indicating she should use caution while driving.

---

[3] Defendant later expressed uncertainty about whether lamotrigine was one of her medications.

Defendant began to feel better, and went to a shopping mall around noon or 1:00 p.m. After making two more stops, she "really was feeling lousy," and decided to head home. She was achy and clammy, was sick to her stomach, was coughing, and her head hurt. She was in Mountain View, and went to highway 280 to get to her home in South San Francisco. She had originally planned to use highway 101, but she took 280 instead, apparently because she thought she might "do better" if she pulled over and stopped for a while, and it would be easier to do so on 280. Because she felt so bad, she testified, "all I could think of was just to get home; the faster the better." She did not know she was driving as badly as Larwood described in the 911 call and in his testimony. She did not believe she was swerving between lanes. When asked why she repeatedly moved toward an exit then returned to the freeway, defendant answered, "I kept thinking I should probably pull off and just stop, but I didn't feel safe even up on 280 to just pull my car off and stop on the side of the road so I just thought if I—then I changed my mind. I figured well, I'll just keep driving, you know, try and get home, you know. I kept thinking I should pull off and stop." She recalled the collision, but did not remember what happened just before it, although she believed she was in the slow lane. She acknowledged her driving was impaired that day, but testified that she drove badly because she was sick, not because of the medications she had taken, and that the medications did not impair her driving.

Dr. Thomas Kearney, a professor of clinical pharmacy, testified on behalf of defendant as an expert in the effects of prescription drugs on the human body and their interaction. He testified that "PERL," or "pupils equal and reactive to light" was a common and reliable diagnostic tool to determine the possible influence of drugs. Even in low doses or with someone who had become tolerant to the drug, codeine caused constriction of the pupils. Pupils that had a normal reaction to light, as defendant's did after the accident, were inconsistent with intoxication from codeine. Defendant had a high respiratory rate after the accident; that rate was consistent with face trauma, and inconsistent with intoxication from codeine, which slows respiration. Similarly, her heart rate was slightly high, which was consistent with pain or recent injury, and inconsistent

with codeine intoxication. The paramedic's findings that defendant had normal eye movement, verbal response, and motor function, and that she was alert and oriented were inconsistent with codeine intoxication.

Dr. Kearney testified that the level of butalbital in defendant's blood sample indicated she had last taken one tablet early on the morning of the accident or the previous day. Similarly, the level of acetaminophen (which was part of the acetaminophen with codeine) was consistent with defendant having taken two tablets at least eight to twelve hours before the blood was drawn. If defendant had taken the butalbital and acetaminophen with codeine an hour or two before the accident, she would have had more acetaminophen and butalbital in her system. The level of lamotrigine was "well below what we see with typical regimens of lamotrigine." The levels of trazodone—an antidepressant also used to aid sleep—and valproic acid were consistent with defendant having taking it the previous night. The levels of these drugs, alone or as a group, would not cause intoxication when mixed with codeine.

The amount of codeine in defendant's blood "could be" consistent with defendant having taken one or two tablets twelve hours previously. Codeine reaches its peak effectiveness in about an hour after ingestion, and loses its toxic and therapeutic effect after about four hours.

According to Dr. Kearney, morphine is the active component of codeine, and codeine has to be metabolized into morphine in order to be effective. Codeine, in and of itself, does not bind well to receptors in the brain, is not effective as a painkiller, and does not cause toxic effects. The majority of the morphine in defendant's blood, 17 nanograms per milliliter, was the inactive metabolite, or three glucuronide. The blood contained three nanograms per milliliter of the active metabolite, six glucuronide. For genetic reasons, some people do not metabolize codeine well, so the drug is ineffective in them. As a result, the drug has no narcotic or soporific effect. Two drugs defendant was taking, Prozac and Wellbutrin, tended to inhibit metabolism of codeine into morphine and thus the therapeutic effects of codeine. Based on the ratios in defendant's blood, Dr. Kearney thought she was unable to metabolize any significant levels of morphine,

10

probably from a combination of genetic factors and drug interactions. He also noted that defendant was continuing to cough at the time of the accident, which suggested the codeine was not effective.

Dr. Kearney acknowledged, however, that in evaluating whether a person was under the influence of codeine, he would look at both the levels of the drug in the person's blood and at the person's behavior pattern, and that the behavioral pattern was the more important of the two. He also acknowledged that tiredness could enhance a drug's narcotic effect, and someone who had the flu and was tired could become more drowsy when taking codeine.

**E. Rebuttal**

In rebuttal, Dr. Missett disagreed with Dr. Kearney's opinion that codeine had no effect until metabolized into morphine. According to Dr. Missett, codeine was a weaker narcotic than morphine, but codeine had a narcotic effect even before it was metabolized into morphine. Dr. Missett explained: "[C]odeine by itself is known as a narcotic by itself, but it's a weaker narcotic than many other narcotics and so it will have an effect even before it's metabolized. It will be metabolized into a stronger narcotic; that's the morphine; but stronger is comparative, just like weaker is comparative. And it's used for pain that is less debilitating than morphine is ordinarily used."

When asked about the effect of the level of codeine in defendant's blood after the accident, Dr. Missett testified that the principal effect of the free codeine would be drowsiness, and that this effect would exist even before the codeine was metabolized into morphine. Based on the amounts of codeine and morphine in defendant's blood, Dr. Missett thought it most likely that the codeine had not yet fully metabolized at the time of the blood test. He pointed out that five of the medications defendant had taken had drowsiness as a side effect, and opined that the synergistic effect of the medications could have caused drowsiness and impaired defendant's driving. Defendant's erratic driving suggested she was impaired by the medications. Although codeine and morphine make someone sleepier and slower in their responses and cause them to have a harder time manipulating things, they do not cause people to be disoriented or unaware of who or

11

where they are. Defendant's responses to the paramedic after the accident were not inconsistent with being under the influence of codeine. Even if she was sleepy before the accident, the accident would make her wide awake. Missett also testified that codeine causes less constriction of the pupils than morphine.

### F. Verdict, Post-Trial Rulings, and Sentencing

The jury found defendant guilty of operating a motor vehicle under the influence of a drug and causing bodily injury to Hernandez and Palacios. (Veh. Code, § 23153, subd. (a).) The jury also found true allegations that defendant personally inflicted great bodily injury on Hernandez and Palacios (Pen. Code, § 12022.7, subd. (a))[4] and that she caused bodily injury to more than one victim (Veh. Code, § 23558).

Defendant moved for a new trial, and the trial court denied the motion. The trial court sentenced defendant to the two-year midterm for driving under the influence (Veh. Code, § 23153, subd. (a)), with a three-year enhancement for personal infliction of great bodily injury (§ 12022.7, subd. (a)) and a one-year enhancement for multiple victims (Veh. Code, § 23558), for a total prison term of six years.

## II. DISCUSSION

### A. Delay in Prosecution

#### 1. Background

As we have explained, portions of defendant's blood sample were tested by the San Mateo County Forensic Crime Laboratory, the Santa Clara County Forensic Crime Laboratory, National Medical Services, and Central Valley Toxicology. Any remaining blood was destroyed.

Before trial, defendant brought a motion to dismiss the action due to pre-complaint delay. The evidence at the hearing showed that the Santa Clara Crime Laboratory received approximately seven milliliters of defendant's blood in February 2005. It sent two and a half milliliters to an outside laboratory, National Medical Services, to test for trazodone. National Medical Services tested the sample and sent a report, then

---

[4] All undesignated statutory references are to the Penal Code.

apparently discarded any remaining blood from the sample that had been sent. The Santa Clara Crime Laboratory used about two and a half milliliters to test the blood, and found the sample tested positive for opiates. About two milliliters of the blood sample remained. A year later, in February 2006, the specimen was returned to San Mateo County.

James Granucci, the director of the San Mateo County Forensic Lab, testified that in February 2006, the district attorney's office requested that the sample be sent to Central Valley Toxicology. The second vial—the one maintained for the defense—still existed and apparently had not been tested. The district attorney did not ask the laboratory to preserve the remaining sample. In 2005, the laboratory did not have a written protocol for retention of blood samples. Instead, it used the one-year retention requirement of Title 17 of the California Code of Regulations. (See Cal. Code Regs., tit. 17, § 1219.1, subd. (g).) At the time of the hearing, the laboratory had no samples of defendant's blood remaining.

Judy Stewart, an expert in forensic toxicology, testified for defendant that the analysis from the Santa Clara Crime Laboratory did not make clear whether the amount of codeine measured in defendant's blood was in the free form, the bound form, or the total of the two, that some of the drugs defendant was taking were not present in the sample, and that two of the analyses differed on whether trazodone was present in defendant's blood sample. If the defense sample of blood were still available, it could be tested to resolve these questions, particularly the composition of the opiates in the sample.[5] It could also have been tested to determine whether the sample in fact came from defendant.

_____

[5] Stewart had not spoken with the analysts from the Central Valley or Santa Clara laboratories, Posey and Gillis. When asked if they could clear up some of the concerns she had about their reports, she replied, "Well, it would certainly help clear up the discrepancy between the two reports as far as the codeine levels go. I'm still a little concerned about the way that the morphine metabolite was reported out, and I'm not sure that that would—I would hope that the analyst would be able to explain that one." When

13

The complaint in this action was filed in April 2006, but defendant testified she did not learn she would be prosecuted until July 2006, the month she was booked and arraigned. In the time between December 2004 and July 2006, defendant did not think she would be prosecuted. She had had a bag with medications in her car, and threw the bottles away when she was finished with them. She was sued in a civil lawsuit as a result of the accident, and settled the action before April 2006. Her teenaged daughter, who had been with her in the hospital after the accident and witnessed the blood draw, was ill during 2006 and died in December of that year.

The prosecutor introduced portions of defendant's deposition taken in Hernandez's civil action on December 29, 2005, in which defendant testified about the medications she took on the day of the accident, how much she took, and the times she took them. The parties agreed that between the accident and the time the case was filed, "the District Attorney's office had communications and dealings with lawyers who represented Salvador Hernandez and that they provided various materials to the District Attorney's office prior to the filing of the case."

The trial court found that defendant suffered "some prejudice for the loss of the blood." The court presumed that the loss of the blood samples was due to the delay in prosecution, and expressed concern that the absence of the blood samples prevented more testing to resolve discrepancies in the two lab tests that were performed. However, the court denied the motion to dismiss the prosecution. The court found that the delay was caused by "proper investigation by the People," that it was not the result of bad faith, and that defendant had not shown that the prejudice from the delay outweighed the justifiable reason for the delay.

### 2. Analysis

"The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy, unjustified delay between the

asked whether the analysts could answer her questions about whether the opiates were in their free form or their total form, she answered, "Once again, I would hope so."

14

commission of a crime and the defendant's arrest and charging. [Citations.] Such prearrest or precharging delay does not implicate the defendant's state and federal speedy trial rights [citations], as those rights do not attach until a defendant has been arrested or a charging document has been filed. [Citation.] [¶] Where, as here, a defendant does not complain of delay after his arrest and charging, but only of delay between the crimes and his arrest, he is 'not without recourse if the delay is unjustified and prejudicial. "[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence." [Citation.] Accordingly, "[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." [Citation.]' [Citation.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*); see also *People v. Nelson* (2008) 43 Cal.4th 1242, 1250–1251.)

" ' "Even a minimal showing of prejudice may require dismissal if the proffered justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal. . . ." [Citation.]' [Citation.] However, '[t]he trial court must engage in the balancing process only if the defendant has shown actual prejudice. [Citation.]" (*People v. Miranda* (2009) 174 Cal.App.4th 1313, 1327.) "Among other things, ' "[p]rejudice [for due process or speedy trial violation claims] may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." [Citation.]' [Citation.] The overarching theme is that the loss of such evidence, especially where the defendant or victims cannot independently recall details of the crime, makes it difficult or impossible for the defendant to prepare a defense thus showing prejudice." (*Id*. at p. 1328.)

15

We review the trial court's ruling for abuse of discretion, and defer to the underlying factual findings if substantial evidence supports them. (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

Here, the trial court found defendant suffered "some prejudice" from the loss of the remaining blood sample. As implied in this finding, the record before the trial court at the time it made its ruling suggests the prejudice was not great. Defendant's expert in forensic toxicology acknowledged that she had not spoken with the analysts who examined defendant's blood and that she "would hope" they could answer the questions she had about their reports. There was no basis to conclude the blood the analysts examined was not defendant's own blood.

As to the justification for the delay, the parties agreed that during the interim between the accident and the time the case was filed, the District Attorney's office was communicating with counsel for Hernandez, one of the victims, who had brought a civil lawsuit against defendant. In defendant's December 29, 2005 deposition in that civil action, she testified that she had taken a number of medications that could cause drowsiness either on the day of the accident or the previous evening. Less than two months later, in February 2006, defendant's blood sample was sent to Central Valley Toxicology for further testing, which revealed butalbital, codeine, morphine, trazodone, and valproic acid, all of which can cause drowsiness.[6] The report of the testing was dated March 6, 2006; the complaint was filed shortly thereafter, on April 10, 2006. On this record, we see no abuse of discretion in the trial court's conclusion that the delay was caused by proper investigation of the case and that defendant had not shown the prejudice outweighed the justifiable reason for the delay.

---

[6] The initial analyses of defendant's blood had detected free codeine and bound morphine, and no trazodone. The initial analyses did not test for any other antidepressants.

## B. Investigation of Defense Team

### 1. *Background*

Defendant's attorney from 2007 until April 2009 was Paula Canny. In March 2009, the two victims of the accident told the district attorney's office that a defense investigator, Carole de Gery, had approached them and offered them $25,000 each, which the investigator told them would come from defendant. De Gery told Palacios the money was a gift because defendant felt guilty. She told Hernandez that if he did not take the money, defendant would use the money to pay for her defense. De Gery did not tell either Palacios or Hernandez they would have to do anything in order to receive the money.

The district attorney's office investigated the matter as a possible bribe. Posing as Hernandez's sister, a legal secretary at the district attorney's office made a "pretext call" to de Gery. De Gery confirmed that she worked for Canny, that she had offered $25,000 to each victim on defendant's behalf and that she told them that if the criminal case continued to trial, defendant would have to use the money to fund her legal defense instead of giving it to the victims.

The district attorney's office concluded it could not prove a crime had been committed, but gave a recording of the call to Canny on March 30, 2009, the day the case was assigned to a trial judge. Canny was told the call would not be used in the People's case-in-chief. Canny consulted counsel and concluded the investigation created a conflict between her and defendant and that she could no longer represent defendant.

On April 1, 2009, defendant filed a motion to dismiss the case based on the district attorney's action, which she asserted deprived her of her right to counsel and due process of law. At the August 2009 hearing, the deputy district attorney handling the case against defendant testified that the office had decided that no charges would be filed in connection with the offer of money unless other evidence was forthcoming. Testimony also showed that at the time of the investigation, the district attorney's office had not yet been able to find the phlebotomist who had drawn defendant's blood after the accident.

17

The trial court denied the motion, concluding that the district attorney's office had a duty to investigate after the two victims reported that defendant's investigator had told them they would receive money if the case did not go to trial, although the pretext call may not have been the "best means" to do so. The court also stated that whether Canny withdrew from the representation was up to her conscience, and advised defendant that in light of the fact that no charges were being brought against Canny, the investigation might not have a chilling effect on her representation. Defendant responded that she felt that Canny was "damaged goods." Canny told the court that her attorney had advised her she had to withdraw.

### 2. *Analysis*

Defendant contends the trial court abused its discretion in denying her motion to dismiss, and that she was denied her Sixth Amendment right to counsel of her choice. Although defendant acknowledges that the information the district attorney's office had received warranted an investigation, she argues the district attorney should have done one of several other things rather than investigating her at that time: inform the court of Hernandez and Palacios's allegations that defendant's investigator had offered them money; refer the matter to the Attorney General; "share any ill feelings with the defense"; recuse the office from the case against defendant; defer investigation until after the trial; or do nothing. Instead, defendant argues, the prosecution chose "the one option that ran afoul of the Sixth Amendment: prosecute Jordan and investigate her defense team on the eve of trial without having informed either court or counsel thereof," thus "manufactur[ing] a conflict in the case, forcing Jordan to part with her counsel." This was structural error, she contends, and the case must therefore be dismissed. For this argument, she relies on *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 146, which states that the Sixth Amendment right to counsel of choice "commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best."

Citing *Boulas v. Superior Court* (1986) 188 Cal.App.3d 422, defendant argues the prosecution interfered with her right to counsel of her choice. There, a defendant charged

18

with selling cocaine told a deputy sheriff he could provide information about major cocaine dealers in exchange for leniency at sentencing. (*Id*. at pp. 425–426.) The deputy discussed the offer with a deputy district attorney, who indicated a deal would be possible only if the defendant replaced his attorney with someone acceptable to the district attorney. The deputy passed this message on to the defendant, who fired his attorney. (*Id*. at pp. 426–427.) The defendant's private investigator later asked the deputy if any of four named attorneys would be acceptable to the authorities, and the deputy told him his office would not be willing to work with any of them. After speaking with the deputy district attorney, the deputy sheriff guided the investigator to the name of an attorney acceptable to the authorities (Attorney C.); Attorney C. had earlier worked for the district attorney's office. (*Id*. at p. 427 & fn. 4.) When he was told the defendant was going to work as an informant, Attorney C. declined the represent him, leaving defendant without an attorney. (*Id*. at pp. 427–428.) Defendant provided detailed information about cocaine dealers, and shortly afterward was told a deal with the authorities would no longer be possible. (*Id*. at p. 428.) The court found the government conduct to be "outrageous in the extreme, and shocking to the conscience." (*Id*. at p. 434.) On these "highly unusual facts" (*id*. at p. 425), the court granted a writ of mandate directing the superior court to dismiss the case (*id*. at p. 435).

No such facts are present here. Defendant does not dispute that the information Hernandez and Palacios provided warranted an investigation. Defendant suggests the district attorney's office should have either referred the investigation to the Attorney General, recused itself from the case, or informed the court of the matter. None of these options, however, would have mitigated any conflict that existed after Canny learned of the investigation. Defendant's other proposed options fare no better. To "share any ill feelings with the defense" or to wait until after the trial to investigate would risk making any investigation ineffective. Defendant also suggests the prosecution should have "do[ne] nothing" when faced with the information, but even she acknowledges that the office would have been "remiss" had it done so.

19

We recognize that in *People v. Prantil* (1985) 169 Cal.App.3d 592, 604, the court concluded that a delay in filing an indictment for forgery against an attorney was justified because the investigating officers "correctly decided" not to investigate the case earlier to avoid the risk of interfering with the attorney's relationship with a client in an unrelated matter. The attorney there was charged with forgery by uttering or using a forged check, which the evidence suggested had been stolen by the attorney's client. (*Id*. at pp. 596, 598.) The facts here—where defense counsel was suspected of impropriety in relation to the very matter before the court—are distinguishable. We see no abuse of the trial court's discretion in denying the motion to dismiss.

## C. Involuntary Intoxication

CALCRIM No. 3427 instructs a jury: "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/ [or] mental state) when (he/she) acted. [¶] A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the force, duress, fraud, or trickery of someone else, for whatever purpose[, without any fault on the part of the intoxicated person]." Defendant requested that the court give this instruction, but modify it to provide, "[A] person can be involuntarily intoxicated if he or she knowingly ingested a prescription medication, but did not know or have reason to anticipate its intoxicating effects." The court refused to give the requested instruction. Defendant contends the trial court erred by not instructing the jury on involuntary intoxication.

"Although a trial court has a sua sponte duty to instruct on all general principles of law closely connected to the facts of the case and this duty extends to defenses which are supported by substantial evidence and are not inconsistent with the defense theory [citation], a court need not give a requested instruction on a purported defense unless it is supported by evidence that is substantial, i.e., that the evidence is reasonable, credible and of solid value." (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165.)

"A person whose intoxication is not voluntary is relieved from liability because of excusable mistake. 'What prevents the intoxication from being voluntary in these cases

20

of fraud is not the trickery of the other person but the innocent mistake of fact by the one made drunk, and an actual ignorance of the intoxicating character of the liquor or drug has the same effect whether the mistake is induced by the artifice of another or not.' " (*People v. Chaffey* (1994) 25 Cal.App.4th 852, 856 (*Chaffey*).) Thus, the court in *People v. Scott* (1983) 146 Cal.App.3d 823, 831, concluded that a defendant who had consumed punch not knowing it was laced with a hallucinogen had acted involuntarily. In *People v. Baker* (1954) 42 Cal.2d 550, 575, our high court stated that an epileptic man might have been considered to be intoxicated involuntarily if the imminent approach of an attack of epilepsy rendered his taking of medication compulsive.

Defendant argues the instruction she requested was proper under *Chaffey*. The defendant in *Chaffey* tried to commit suicide by taking approximately 120 Xanax tablets, then lay down to die. She had no recollection of anything between taking the tablets until she awoke in a hospital. In the interim, however, she was observed driving a car in an erratic manner. (*Chaffey, supra,* 25 Cal.App.4th at p. 854.) The warning label on the drug stated it would cause drowsiness and one should not operate heavy equipment while taking the medication. An overdose of the drug could cause unconsciousness. (*Ibid.*) The trial court found that the defendant did not predict the drug would make her unconscious rather than killing her, but that she *did* predict its intoxicating effect. (*Ibid.*) The trial court convicted her of driving under the influence of an intoxicating drug. (*Id*. at p. 853.) The appellate department, however, reversed, concluding that "on the undisputed facts as a matter of law Chaffey did not know and a reasonable person in her condition would not have known that taking an overdose of this medication would have caused intoxication. From this premise the [appellate department] concluded that her intoxication was involuntary and thus her unconsciousness stands as an invulnerable defense to the charges." (*Id*. at p. 857.)

The Court of Appeal disagreed with the appellate department's ruling and affirmed the trial court's judgment, concluding that although a trier of fact *could* legitimately have made such findings, the undisputed facts did not necessarily lead to the conclusion that the defendant's intoxication was involuntary: "[The defendant]

21

voluntarily swallowed the Xanax tablets. The label warned her that the medication would cause drowsiness. There was substantial evidence here from which the trier of fact could conclude that Chaffey's intoxication was voluntary." (*Chaffey*, *supra*, 25 Cal.App.4th at p. 857.) Although it might be true that the defendant did not expect to be able to stand up or drive a car, it was reasonably foreseeable that before Chaffey fell asleep, "something would happen." (*Id*. at pp. 857–859.)

Defendant argues that, under *Chaffey*, the "pivotal question" is whether she "knew or had reason to anticipate that her use of the prescription medication could cause intoxicating effects," and that she produced evidence that could lead a trier of fact to answer that question in the negative. That evidence, according to defendant, is that she is a long-term user of codeine, and such long-term use tends to negate the analgesic effects of the substance; and that Dr. Kearney's testimony indicated that defendant did not metabolize codeine into the free form of morphine required to produce an analgesic effect. That evidence, if believed, could have led the jury to conclude she was not *in fact* under the influence of drugs on the day of the accident, but it does not support a theory that she was in fact, but *unexpectedly*, under their influence.

Defendant also points to evidence that she had taken the same combination of drugs before without experiencing drowsiness that prevented her from driving safely. The evidence shows, however, that defendant had been warned, either by her doctors or by the pharmacy warnings, that her medications could cause drowsiness. Moreover, in her own testimony, she acknowledged that on a number of occasions during the drive, she thought she should pull over and stop driving. On this record, we agree with the trial court that there is no substantial evidence defendant was unaware of the intoxicating effects of her medications. There was therefore no error in failing to instruct the jury on the defense of involuntary intoxication.

In her brief on appeal, defendant relies upon authorities providing that a person who becomes intoxicated involuntarily and commits acts *unconsciously* is not held criminally responsible for those acts. (See § 26; see also *People v. Velez* (1985) 175 Cal.App.3d 785, 793 [defendant who smoked marijuana that unbeknownst to him was

laced with PCP not entitled to instruction on defense of unconsciousness due to involuntary intoxication].) At trial, however, her counsel told the court she was not relying on a theory of unconsciousness; rather, he explained to the court, the issue was "strictly whether involuntary intoxication can be based on unanticipated effects of drugs on a person." In any case, the evidence would not support a conclusion that defendant acted unconsciously.

### D. Motion for New Trial

After the jury rendered its verdict, defendant moved for a new trial on the ground of newly discovered evidence developed after trial. According to the motion, defense counsel had told the defense expert, Dr. Kearney, that in the prosecution's rebuttal case, Dr. Missett had disagreed with Dr. Kearney's testimony that codeine had no effect until metabolized into morphine and that the other drugs found in defendant's system could not have caused her impairment, either singly or in combination with codeine. Dr. Kearney consulted faculty from the University of California, San Francisco (UCSF) who were associated with the San Francisco Division of the California Poison Control System. The group's consensus was: "A. That it is not established nor proven that codeine alone, at the levels found in the defendant, can cause intoxication. [¶] B. The defendant had significant impairment of metabolism of codeine. This led to a lack of metabolic conversion into morphine and/or morphine 6-glucuronide, which are the known major active metabolites responsible for the therapeutic and toxic effects of codeine." The moving papers stated that Dr. Missett had not prepared a written report of his opinion before trial, but that the prosecutor had told defense counsel what his testimony might be. Defendant argued that "it was only during trial that the issues became clear and allowed for joining the very technical issue of potential impairment from codeine or other prescription drugs that was presented in this case."

A hearing was held on the motion. Dr. Kearney testified that he was surprised by Dr. Missett's testimony on rebuttal, which he said was contrary to conventional wisdom regarding the effects of codeine. He presented the issue to a weekly conference at UCSF. About 25 people were present, including a professor of medicine at UCSF who was board

certified in toxicology and director of the poison center, another doctor board certified in toxicology, and a doctor with expertise in metabolization of drugs. They reviewed literature on pharmacology of drugs and human trials of codeine that "looked at both the parent and the metabolite levels and looked at the subsequent effects as they escalated the dose," including effects on breathing, pupil size, heart rate, vigilance, and ability to concentrate. Dr. Kearney testified that there was no proof that codeine itself can cause intoxication; rather, intoxication required metabolism to morphine or to the glucuronide metabolite. Failure to metabolize codeine blocked both the therapeutic and the toxic effects of the drug. Based on the high level of codeine and the low levels of metabolites in defendant's blood, Dr. Kearney testified that there was no scientific support for an opinion that defendant could have been impaired from the codeine alone. The conclusion of the committee reinforced the conclusion Dr. Kearney had already reached and to which he had testified.

The trial court denied the motion, telling defense counsel, "I think you did an incredible job and you did put on Doctor Kearney as best you could in the trial and all of this information was presented to jury and they chose for whatever reason to I think go with the People's expert." Defendant contends this ruling was error.

After a criminal trial, a court may grant a new trial only upon limited grounds, among them "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at trial." (§ 1181, subd. (8).) A ruling on a motion for a new trial rests within the trial court's discretion, and we will not reverse unless there is a manifest and unmistakable abuse of that discretion. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1251–1252; *People v. Staten* (2000) 24 Cal.4th 434, 466.)

We see no abuse of discretion in the trial court's ruling. The assertedly new evidence was simply that a number of other doctors agreed with Dr. Kearney's opinion. It would have done nothing more than repeat and reinforce evidence the jury had already heard. Moreover, although defendant presents Dr. Missett's testimony on rebuttal—that unmetabolized codeine could have an intoxicating effect—as unexpected, it was in fact

24

fairly contained within the evidence the prosecution presented in its case-in-chief. Posey testified that the level of codeine in defendant's blood fell within the range that could cause sleepiness or disorientation, and that the free form of codeine "can get into the brain" and may cause impairment. Dr. Missett testified in the prosecution's case-in-chief that codeine that was not metabolized into morphine or did not become attached to glucuronide remained free, and that the codeine defendant had taken was the main cause of her impaired driving. There was no reason defendant could not, in the exercise of reasonable diligence, present evidence that codeine did not cause intoxication unless metabolized—and in fact she did so. In the circumstances, we will not disturb the trial court's ruling.

### III.    DISPOSITION

The judgment is affirmed.


_____
Rivera, J.


We concur:


_____
Ruvolo, P.J.


_____
Humes, J.


25