Filed 6/20/23  P. v. Murphy CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GEORGE DEON MURPHY,<br><br>Defendant and Appellant. | B318416<br><br>Los Angeles County<br>Super. Ct. No. TA150548 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Allen J. Webster, Jr., Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

The People tried George Deon Murphy twice for murder, attempted murder, and unlawfully possessing a firearm. The first trial ended in a mistrial in November 2020. The court continued the second trial several times over Murphy's objections, primarily because the prosecutor had trouble finding her witnesses. Murphy's second trial started in September 2021, and the jury convicted him of all counts. On appeal, Murphy argues the roughly 10-month delay between the mistrial and start of the second trial violated his right to a speedy trial. He also argues the trial court erred by imposing fines and fees at sentencing without holding an ability-to-pay hearing. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

On December 18, 2019, the People charged Murphy with murder (Pen. Code, § 187, subd. (a); count 1),[1] attempted willful, deliberate, and premediated murder (§§ 187, subd. (a), 664; count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3). The People also alleged various firearm enhancements on the murder and attempted murder counts. Murphy was arraigned the same day, and he remained in custody pending trial.

At Murphy's request, the court continued trial to April 2, 2020. Due to the COVID-19 pandemic, in late March 2020, the Los Angeles County courtrooms closed for judicial business and the statutory deadlines for trials were extended repeatedly by emergency orders. Under those orders, the court continued

---

[1]     Unless noted, undesignated statutory references are to the Penal Code.

Murphy's trial until November 2, 2020, setting the last day for trial as November 9, 2020. Trial started on November 4, 2020.

The jury was unable to reach a unanimous verdict, and the court declared a mistrial on November 23, 2020. Murphy waived time until May 2021. After several continuances over Murphy's objections—which we discuss in detail below—the case was called for trial on September 9, 2021.

At the second trial, the prosecution presented evidence that Murphy had a child with Tanee Bufkin. Tanee's sister, Enjonae Bufkin,[2] was in a relationship with Johnny Gladden.

According to Gladden, on October 25, 2019, he started a physical fight with Murphy. During the fight, Murphy stabbed Gladden in the arm, and Gladden hit Murphy with a metal pipe. Enjonae ended the fight by spraying Gladden and Murphy with mace.

A couple of weeks later, on November 5, 2019, Gladden's childhood friend, Lavon Wright, was visiting from out of town. Gladden and Wright drove to a store in Gladden's Jeep. Gladden noticed Murphy's car nearby. After leaving the store, they drove to Tanee's apartment and then to a bank.

On the way to the bank, a car pulled up beside Gladden's Jeep and started shooting at it. At the first trial, Gladden testified he saw Murphy in the other car; at the second trial, Gladden claimed he did not know if it was Murphy.

Wright was struck by a single bullet to the chest, which was fatal. He was pronounced dead at the scene around

---

[2]     We refer to Tanee Bufkin and Enjonae Bufkin by their first names for the sake of clarity. We mean no disrespect.

1:00 p.m. Several other bullets struck the Jeep, but Gladden was not injured.

Shortly after the shooting, Gladden called Enjonae and told her "this bitch ass nigga just shot up the car." Enjonae understood Gladden to be referring to Murphy.

Wright's father, Lavon Wright, Sr., spoke to Gladden a day or two after the shooting. According to Wright Sr., Gladden told him the man who shot Wright had a child with Gladden's girlfriend's sister. Gladden said he had previously fought the shooter and had gotten the upper hand.

Fidel Bernal testified that he saw Murphy the day of the shooting. Murphy had hired Bernal to replace broken glass on one of his cars.[3] Bernal showed up at Murphy's house around 12:55 p.m. on November 5, 2019, and he sent Murphy a text message stating, "I am here." Murphy did not respond, so Bernal called his phone several times; Murphy did not answer. At trial, Bernal testified that he waited around 10 minutes before Murphy returned home. At the preliminary hearing, Bernal testified that he waited around 30 minutes.

Police interviewed Murphy the day after the shooting. Murphy told the police that Gladden had previously beaten him with a metal pipe and damaged his car. Murphy, however, denied having anything to do with the shooting. Murphy said he was out running errands the day of the shooting, but he was never near the bank. According to Murphy, he was at home when Bernal sent him a text message stating, "I'm here."

---

[3]     Murphy allegedly was driving a different car at the time of the shooting.

4

Murphy walked outside and saw Bernal down the street, talking to someone else.

The prosecutor played for the jury surveillance videos showing Gladden's Jeep being followed by a light-colored sedan, which resembled a car Murphy owned. Also, the parties stipulated that Murphy had suffered a prior felony conviction within the meaning of section 29800.

The jury found Murphy guilty as charged, and it found true the firearm enhancements. The court sentenced Murphy as follows: for murder (count 1), 25 years to life, plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)); for attempted murder (count 2), life plus 20 years for the firearm enhancement (§ 12022.53, subd. (c)); and for unlawful possession of a firearm (count 3), three years concurrent with the sentence on count 1. Without objection, the court imposed various fines and fees.

Murphy timely appealed.

## DISCUSSION

### 1. *Murphy received a speedy trial*

Murphy contends the delay between the end of his first trial and the start of his second trial violated his statutory and constitutional rights to a speedy trial.

#### a. *Background*

"In early March 2020, the Governor of California declared a state of emergency in California, and the President declared a national emergency due to the COVID-19 pandemic. Based on health recommendations, the Chief Justice of the State of California issued statewide emergency orders suspending in-person jury trials and, among other things, extending statutory deadlines for trials in criminal proceedings.

5

The Chief Justice authorized local courts to adopt local rules to address the impact of the COVID-19 pandemic." (*Elias v. Superior Court* (2022) 78 Cal.App.5th 926, 931 (*Elias*).) Under this authority, the Presiding Judge of the Los Angeles Superior Court (LASC) issued a series of general orders extending the deadlines to hold criminal trials.[4]

The court in this case declared a mistrial on November 23, 2020, and Murphy waived time until April 20, 2021, as day 0 of 30 for the start of the second trial. The original deadline for the second trial to start, therefore, was May 21.[5]

The parties returned to court on Friday, May 14, and Murphy announced ready. The court, however, noted the

---

[4] (See, e.g., LASC General Order No. 19 (April 22, 2021) <https://www.lacourt.org/newsmedia/uploads/1420214221726492 1NRAPRIL2021GENERALORDER.pdf> [as of June 16, 2023], archived at <https://perma.cc/A959-HV3H>; LASC General Order No. 21 (May 20, 2021) <https://www.lacourt.org/ newsmedia/uploads/14202152016241021NR_MAY_2021_GO.pdf> [as of June 16, 2023], archived at <https://perma.cc/4MFY-W5VW>; LASC General Order No. 22 (June 17, 2021) <https://www.lacourt.org/newsmedia/uploads/1420216188292221 NRJuneGO2021_061821.pdf> [as of June 16, 2023], archived at <https://perma.cc/PCF7-WNDC>; LASC General Order No. 27 (July 19, 2021) <https://www.lacourt.org/newsmedia/ uploads/1420217191502221NRJuly19GOwithOrder.pdf > [as of June 16, 2023], archived at <https://perma.cc/S9KC-NBXP>; LASC General Order No. 28 (Aug. 13, 2021) <https://www.lacourt.org/newsmedia/uploads/1420218131602021 NRAugust13_GO.pdf > [as of June 16, 2023], archived at <https://perma.cc/K7MQ-3D6N>.)

[5] Unless otherwise noted, all dates are in 2021.

People had asked to continue the trial until Monday, "based upon the inability or difficulty of obtaining service on a material witness . . . ." The prosecutor also told the court she had subpoenaed Bernal—the glass repairman—to appear that day, but he had not shown up to court. The court granted the continuance and issued a body attachment for Bernal, which it held at the People's request. Murphy moved to dismiss the case, which the court denied "as both being premature and not mandated by law" because the statutory deadline for trial had not yet passed.

On Monday, May 17, the prosecutor asked for another continuance because she had not been able to serve the "named victim." Murphy moved to dismiss the case, which the court denied as premature. The court explained that a recent COVID-19 general order had extended trial deadlines by 30 days, meaning the last day for trial was now June 21. At the prosecutor's request, the court held the body attachment for Bernal.

At some point before the next court date, the People filed a motion to continue under section 1050, subdivision (g). That provision provides there is good cause for a continuance in a murder case if the prosecuting attorney has another trial in progress. (§ 1050, subd. (g)(2).) Murphy conceded the prosecutor had met the foundational requirements for the continuance, but he moved to dismiss the case anyway. The court denied the motion as premature, noting the statutory deadline had not yet passed. The prosecutor asked the court to continue to hold the body attachment for Bernal, which it did.

On June 18, the prosecutor again moved for a continuance under section 1050, subdivision (g). Murphy objected, arguing

7

any further delay violated his state and federal speedy trial and constitutional due process rights.

The court overruled Murphy's objection and continued the trial to July 8.  In granting the continuance, the court noted the LASC Presiding Judge's latest general order had once again extended trial deadlines by 30 days.  The court also explained the "People have a valid good cause because they are engaged in trial, and this is a murder trial . . . ."  At the prosecutor's request, the court held the body attachment for Bernal until July 8.

Murphy again announced ready on July 8, but the People asked to continue trial to July 15.  Murphy moved to dismiss with prejudice, arguing any continuance under the latest COVID-19 general order was discretionary and the People's reasons for the continuance were not related to the pandemic.

The court denied Murphy's motion and granted a continuance.  The court also agreed to continue holding the body attachment for Bernal, but it noted that "[t]o the extent that there's a request for the Court to find due diligence on the part of the People to secure their witness, it doesn't look good.  You continue to ask me to hold the warrant, which means you have no authority to arrest the witness, which suggests that your office is not engaging in due diligence."

On July 15, the People asked for another continuance, and the court continued the trial to July 19.  Murphy argued the continuance was prejudicial because the People had "additional time to get their evidence, to try to find their witness, and I object and move to have the case dismissed with prejudice."  The court denied the motion, noting the statutory deadline, as extended by the COVID-19 general orders, had not yet passed.

On the next court date, July 19, the People again said they were not ready. Defense counsel argued, "My client is extremely frustrated, and I just want him to know that this not any of my doing. [¶] I again am moving for this case to be dismissed on due process grounds, State, Federal case law, and U.S. and State constitution. We're ready, and my client deserves his trial, and he is very upset."

The court said it shared Murphy's frustrations and was upset as well, although for different reasons. The court explained: "I would . . . note that since April 20th, the People have never been ready, so for the last three months, the People have not been ready. [¶] There is an outstanding body attachment for the witness who actually testified . . . ." "[a]t the preliminary hearing . . . . [¶] The body attachment has never been released. I think it has something to do with the policy of the new district attorney, which is again somewhat frustrating because the People can't announce ready because they can't show due diligence of even attempting to get the witness in. So the effect of the order is not to help the court; the effect of the order is to enable the D.A. to not be prepared. [¶] . . . [I]t has enabled the district attorney's office to use this continuance in a very inappropriate way."

Despite its frustrations, the court denied Murphy's motion to dismiss because the statutory deadline had not yet passed, and Murphy had not shown a violation of due process. The court continued the trial to August 16, and again agreed to hold Bernal's body attachment until the next hearing.

On August 4, the court issued body attachments for Enjonae and Gladden, which it held at the prosecutor's request. Five days later, on August 9, Enjonae and Gladden appeared in

court and the court recalled and quashed the body attachments. The court ordered Enjonae and Gladden to return on August 16.

On Monday, August 16, the prosecutor asked for another continuance because Wright's father had suffered a stroke over the weekend and had only recently been released from the hospital. Murphy moved to dismiss, arguing the prosecutor was using the emergency general orders to obtain continuances unrelated to the pandemic.

The court granted the continuance and denied Murphy's motion, explaining the statutory deadline had been extended by another 30 days under the latest general order. The court noted it agreed with Murphy that the "general orders have enabled the prosecution to continue cases without good cause, because that's what the current case law allows; however, in this instance there has been a change in circumstances. Apparently, one of the witnesses had a recent medical emergency."

The court also noted that two witnesses who had previously been unavailable—and were the reason the People had not been ready for trial—were in the audience, which provided an additional change in circumstances. It appears the court was referring to Enjonae and Gladden. The court erroneously stated there were outstanding body attachments for both witnesses.

The court proposed continuing the trial to August 25, but defense counsel said he had a planned vacation in early September. To accommodate counsel's schedule, the court continued the matter to September 9, with September 17 as the deadline to start trial. At the prosecutor's request, the court held the body attachment for Bernal.

The court called the case for trial on September 9, and jury selection started the next day.

10

b.  *Relevant law*

A defendant has the right to a speedy trial under both the California and federal constitutions.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  Although the speedy trial guarantees are similar, they are independent and operate somewhat differently.  (*People v. Martinez* (2000) 22 Cal.4th 750, 765 (*Martinez*).)

The Sixth Amendment to the federal constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  (U.S. Const., 6th Amend.)  In *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*)*,* the United States Supreme Court articulated a balancing test to determine whether a delay in prosecution amounts to a violation of this right.  (*Id.* at p. 530.)  Under that test, the court must consider four factors: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay."  (*Martinez*, *supra*, 22 Cal.4th at p. 755.)

Similar to the federal constitution, the California constitution guarantees a "defendant in a criminal cause . . . the right to a speedy public trial . . . ."  (Cal. Const., art. I, § 15.)  The Legislature implemented this right by enacting sections 1381 to 1389.8.  (*Martinez, supra*, 22 Cal.4th at p. 766.)  Section 1382, subdivision (a) provides that, "unless good cause to the contrary is shown," a court "shall order the action to be dismissed" when a defendant in a felony case "is not brought to trial within 60 days of the defendant's arraignment on an indictment or information, . . . or, in case the cause is to be tried again following a mistrial, . . . within 60 days after the mistrial has been declared . . . ."  (§ 1382, subd. (a)(2); see §§ 1049.5, 1050, subd. (e).)

11

"No affirmative showing of prejudice is necessary to obtain a dismissal for violation of the state constitutional speedy trial right *as construed and implemented by statute.* [Citation.] Instead, 'an unexcused delay beyond the time fixed in section 1382 of the Penal Code without defendant's consent entitles the defendant to a dismissal.' [Citation.]" (*Martinez, supra,* 22 Cal.4th at p. 766.)

"Because the state constitutional speedy trial right is self-executing and broader than its statutory implementation, a defendant may claim a violation of the state Constitution's speedy trial right based on delay not covered by any statutory speedy trial provision." (*Martinez, supra,* 22 Cal.4th at p. 766.) When a defendant claims a non-statutory violation of the right to a speedy trial, the court "must balance the competing interests involved to determine whether [the defendant] has been denied his right to a speedy trial. The prejudicial effect of the delay on [the defendant] must be weighed against any justification for the delay." (*Jones v. Superior Court of Los Angeles County* (1970) 3 Cal.3d 734, 740.) The same balancing approach applies when the defendant's claim sounds in due process, rather than the right to a speedy trial. (*Scherling v. Superior Court of Santa Clara Cty.* (1978) 22 Cal.3d 493, 505.)

Unlike the federal constitutional standard, an " 'uncommonly long' " delay does not trigger a presumption of prejudice for claims arising under our state's constitution. (*People v. Lowe* (2007) 40 Cal.4th 937, 942.) Instead, the defendant "must show that the delay has impaired the ability to defend against the charged crime because, for instance, a witness has become unavailable, evidence has disappeared, or the memory of a potential witness has faded." (*Id.* at p. 946.)

12

"The defense has the initial burden of showing prejudice from a delay in bringing the defendant to trial. Once the defense satisfies this burden, the prosecution must show justification for the delay. If the prosecution does that, the trial court must balance the prejudice to the defendant resulting from the delay against the prosecution's justification for the delay." (*Id*. at p. 942.)

    c.     *The continuances did not violate section 1382*

In passing, Murphy argues the trial court violated section 1382 by continuing his trial, without his consent, beyond the 60-day deadline.

Contrary to Murphy's suggestions, the 60-day deadline in section 1382 is not absolute. In times of emergency, including epidemics, the presiding judge of a superior court may request, and the Chief Justice of California may authorize, extensions to the deadline. (Gov. Code, § 68115, subd. (a)(10).) Under this authority, the LASC Presiding Judge issued emergency general orders on April 22, May 20, June 17, July 19, and August 13, 2021. (See fn. 4, *ante*.) Those orders extended the section 1382 deadline by 30 days for cases where the last day for trial fell between April 24 and May 21, May 22 and June 18, June 19 and July 16, July 17 and August 13, and August 14 and August 27, 2021, respectively.

Here, Murphy waived time until April 20, as day 0 of 30 for purposes of section 1382. Therefore, under the above general orders—which Murphy does not challenge on appeal—the last day to start his second trial was September 17. Murphy's case was called for trial on September 9, and jury selection started the next day. Trial, therefore, started before the deadline, and there was no statutory violation. (See *Elias*, *supra*, 78

13

Cal.App.5th at 941 [finding no violation of section 1382 where the statutory deadlines were extended by emergency orders related to the COVID-19 pandemic].)

      d.    *The continuances did not violate Murphy's constitutional rights*

Murphy alternatively argues the delay between the mistrial and start of his second trial violated his right to a speedy trial under the federal and state constitutions.  Although the federal and state standards are not identical, because each requires us to weigh many of the same factors, we consider them together.

      i.    Length of the delay

The United States Supreme Court has explained that, at least under the federal standard, the length of the delay "is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.  Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." (*Barker, supra*, 407 U.S. at pp. 530–531.)  The issue for the court to decide is whether the delay "has crossed the threshold dividing ordinary from 'presumptively prejudicial' . . . ." (*Doggett v. U.S.* (1992) 505 U.S. 647, 651–652.)  The government has not denied a defendant a speedy trial if it has "prosecuted his case with customary promptness." (*Ibid*.)  Courts generally have held a delay that "approaches one year" is sufficient to require the court to balance the other *Barker* factors.  (*Doggett*, at p. 652.)

Here, the total delay between the mistrial and the start of the second trial was a little more than nine and a half months.

14

Murphy fails to point us to any authority holding a delay of less than 10 months in a case of comparable magnitude is presumptively prejudicial. Indeed, a ten-month delay is not at all uncommon in murder cases.

Nevertheless, we will assume, for the sake of argument, that the delay between the mistrial and Murphy's second trial was presumptively prejudicial. Accordingly, we must balance the length of the delay with the other *Barker* factors: the reasons for the delay, Murphy's assertion of his rights, and the prejudice he suffered.

ii. Reasons for the delay

When considering the reasons for a delay, a "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker, supra*, 407 U.S. at p. 531, fn. omitted.)

The record does not reveal the reason for the roughly six-month delay immediately following the mistrial. Murphy, however, agreed to waive time during that period. Therefore, no matter the reason, the weight accorded to the delay is reduced. (See *People v. Landau* (2013) 214 Cal.App.4th 1, 37 [when the "delay was at [the defendant's] request or with his consent, the weight accorded the delay is reduced"].)

The court first granted a continuance over Murphy's objection on May 14. The prosecutor initially requested the

15

court continue the case only by one court day because she was having difficulty "obtaining service on a material witness." The prosecutor did not name the witness. However, at the next hearing, she requested an additional continuance because she did not have the "named victim" under subpoena. Presumably, then, the prosecutor was referring to Gladden in both instances. Based on these representations, the court continued the case until June 14.

Generally, a missing witness provides a valid reason to delay a trial. (*Barker, supra*, 407 U.S. at p. 531.) In considering whether to grant a continuance for that reason, a court should consider whether " '(1) the party seeking the delay has exercised due diligence in securing the attendance of the witness at trial by legal means, (2) the testimony of the witness is material, (3) the testimony is not merely cumulative, (4) the attendance of the witness can be obtained within a reasonable time, and (5) the facts about which the witness is expected to testify cannot otherwise be proven.' [Citations.]" (*Elias, supra*, 78 Cal.App.5th at pp. 938–939.)

Gladden was a named victim and the only known eyewitness to the crimes. His testimony was the cornerstone of the prosecution's case, and the facts about which he was expected to testify could not otherwise have been proven. When the prosecutor requested the continuances, there was nothing to suggest she would be unable to serve Gladden in a reasonable time. Nor is there any indication that Gladden's absence was the result of the prosecutor's negligence or deliberate actions. Under these circumstances, and especially considering the importance of Gladden's testimony to the prosecution's case, his absence

16

provided a valid reason to grant the continuances and justified the one-month delay.

Turning to the next significant delay—which lasted approximately three weeks, from June 14 through July 8—the prosecutor requested two continuances because she was engaged in trial on another matter. Murphy does not contest that this constituted a valid reason for the continuances, nor could he. The length of the delay, moreover, was relatively short and reasonable under the circumstances.

The court granted additional continuances from July 8 through August 16, apparently because some of the prosecution's witnesses were missing. Murphy contends there was not good cause for these continuances because the prosecutor had not used all legal means to locate the missing witnesses. He points to the prosecutor's repeated requests that the court hold Bernal's body attachment, which the court noted "suggest[ ] that [the prosecutor's] office is not engaging in due diligence." Murphy also points to the court's later remark that it was frustrated that "the People can't announce ready because they can't show due diligence of even attempting to get the witness in. So . . . the effect of the [emergency COVID-19] order is to enable the D.A. to not be prepared. [¶] . . . [I]t has enabled the district attorney's office to use this continuance in a very inappropriate way."

Contrary to Murphy's contentions, the record does not show the continuances during this period were related to the prosecutor's requests that the court hold body attachments. Although the prosecutor did not state on the record why she was requesting the continuances, on August 16, the court noted that Gladden and Enjonae were in the courtroom, and their presence resolved the issue that had been causing the delays. Neither

17

the prosecutor nor Murphy corrected the court. Presumably, then, the prosecutor requested the continuances because Gladden and Enjonae were missing.

Unlike the body attachment for Bernal, the prosecutor did not ask the court to hold the body attachments for Gladden or Enjonae for a significant period. The court first issued the attachments for Gladden and Enjonae on August 4, and it held them only until August 9. The prosecutor, moreover, did not seek any continuances during that brief time.

Nor is it obvious, as Murphy seems to suggest, that the court found the prosecutor lacked good cause for the continuances. The court's remark that the prosecutor "is not engaging in due diligence" concerned only her requests to hold Bernal's body attachment; it was not related to her trouble finding Gladden and Enjonae, which appears to be the reason she had requested the continuances. It also appears the court's statement that the "district attorney's office" is using the emergency general orders "in a very inappropriate way," was directed at the general policies of the District Attorney's office, rather than the prosecutor's specific actions in this case. Indeed, the court clarified that it was "not attacking or criticizing [the prosecutor] personally."

Even if the prosecutor's lack of diligence had caused the delays during this period, there is nothing even to suggest she was deliberately delaying the trial in order to hamper the defense. At most, the record supports a finding that the prosecutor was negligent. Although a prosecutor's negligence weighs in favor of the defendant, because the delay here was relatively short—roughly five weeks—it alone does not substantially tip the scales in Murphy's favor.

18

The last significant delay lasted from August 16 through September 9. The prosecutor requested a short continuance because one of her witnesses, Wright Sr., had recently suffered a stroke. Murphy seems to concede this was a valid reason to continue the trial. The court, moreover, extended the continuance from August 25 until September 9 to accommodate defense counsel's schedule. That portion of the delay, therefore, worked to benefit Murphy.

To summarize, Murphy consented to delay his second trial by approximately six months, which amounted to more than half of the 10-month period between the mistrial and the start of the second trial. Of the remaining four months of delay (roughly 16 weeks), around 10 weeks were related to the prosecutor's difficulty finding key witnesses, three and a half weeks were related to the prosecutor's trial in another case, a week and a half was related to a witness's medical condition, and two and a half weeks were related to accommodating defense counsel's schedule.

### iii.  Murphy's assertion of his rights

As to the next factor—the defendant's assertion of his rights—"[t]he strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." (*Barker, supra*, 407 U.S. at pp. 531–532.)

19

Here, between May and September 2021, Murphy repeatedly asserted his right to a speedy trial and moved to dismiss the case. He did not, however, seek writ relief after the court denied his motions, which suggests he was not experiencing extraordinary personal prejudice. Nevertheless, this factor weighs in his favor.

           iv.    Prejudice

We assess the last factor—prejudice—in light of the interests the right to a speedy trial was designed to protect, with the most emphasis placed on the possibility that the defense will be impaired. (*Barker, supra*, 407 U.S. at p. 532.) "If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." (*Ibid.*) If the delay is " 'uncommonly long,' " prejudice is presumed, and the defendant need not make an affirmative demonstration that the government's want of diligence prejudiced the defendant's ability to defend against the charge. (*Martinez, supra*, 22 Cal.4th at p. 755.)

Murphy contends the delays caused him to suffer actual prejudice because two of the prosecution's witnesses—Bernal and Wright Sr.—suffered medical conditions before the start of the second trial. Bernal, for example, testified he no longer has a "good memory" and "forget[s] a lot of things" after having suffered three strokes. Wright Sr. was hospitalized after suffering a stroke about a month before he testified at the second trial.

As to Bernal, while we acknowledge the strokes likely affected his memory of relevant events, Murphy has not shown his recollection worsened during the specific period between the

20

mistrial and the second trial. Bernal testified that he suffered the strokes around 2019, well before the court declared a mistrial in the first trial. Therefore, had the second trial not been delayed beyond May 2021, Bernal likely would have given the same testimony.

Even if Bernal's memory had worsened during the delay, Murphy has not shown it was prejudicial. To the contrary, Bernal's fading memory seems to have worked in Murphy's favor. Bernal was a key witness for the prosecution because he contradicted Murphy's alibi. Murphy claimed he was at home at the time of the shooting, waiting for Bernal to repair glass on his car. Bernal, however, testified that he arrived at Murphy's house right around the time of the shooting, and Murphy was not home. At the preliminary hearing, Bernal testified that he waited 30 minutes for Murphy. At trial, he testified that he waited only 10 minutes. Bernal's testimony at trial, in other words, was more favorable to Murphy. Therefore, if anything, the delay in trial was helpful for Murphy, at least with respect to Bernal's testimony.

Murphy similarly has not shown he was prejudiced by the fact that Wright Sr. had suffered a stroke during the delay. Unlike Bernal, Wright Sr. did not explicitly testify his memory was impaired. Nor did he struggle to recall facts or to answer any questions at trial. There is nothing to suggest the stroke had any effect on his testimony, let alone an effect that harmed Murphy.

Murphy alternatively argues he was prejudiced because the delay in trial caused him to decompensate, which impaired his ability to assist in his defense. In support, he points to several instances where the court admonished him not to

speak to or interrupt defense counsel while counsel was engaged in other matters.  Murphy also points out that he was charged with assault for throwing a " 'brown liquid' " at a guard while in custody, there is some indication he suffers from mental illness, and he had a difficult childhood.

We do not doubt that prolonged pretrial incarceration has significant psychological consequences.  Nevertheless, there is nothing in the record to suggest Murphy's disruptive behavior was specifically caused by the delay in trial, rather than a reflection of his character.  Indeed, most of the events upon which Murphy relies occurred before the mistrial, and there seem to have been fewer disruptive incidents as time went by.  We also fail to see how Murphy's history of mental illness and childhood trauma are connected to the delay in trial.

v.    Balancing

Balancing the above factors and considering them in the context of the entire record, we conclude the delay did not violate Murphy's federal or state constitutional rights.  A 10-month delay before trial is not uncommon, especially for a case involving a murder and attempted murder.  Tellingly, Murphy repeatedly agreed to waive time between November 2020 and May 2021, and he objected only to a fraction of the total delay.  As to that portion—which totaled roughly four months—the court granted continuances because the prosecutor was struggling to find key witnesses, the prosecutor was engaged in another trial, a witness suffered a serious medical emergency, and defense counsel had a scheduling conflict.  Each continuance was supported by a valid reason or worked to Murphy's benefit.  Murphy, moreover, has not shown the prosecutor deliberately delayed trial in order to hamper his defense; at worst, she was negligent for a few weeks.

Nor has Murphy shown any concrete prejudice caused by the delay. Although two witnesses suffered strokes before trial, the record does not show the delay itself affected their testimony in a manner detrimental to Murphy. In fact, Bernal's trial testimony was more beneficial to Murphy than the testimony he gave before the delay. While we acknowledge that Murphy remained in custody during the delay, "[l]engthy pretrial incarceration ' " 'unenhanced by tangible impairment of the defense function and unsupported by a better showing on the other [*Barker*] factors than was made here, does not alone make out a deprivation of the right to a speedy trial.' " ' [Citation.]" (*Elias, supra*, 78 Cal.App.5th at p. 943.) Under these circumstances, Murphy has not shown the delay in trial violated his constitutional rights.

## 2. *Murphy is not entitled to an ability-to-pay hearing*

At sentencing, the court imposed a restitution fine of $300 (§ 1202.4, subd. (b)), a stayed parole revocation restitution fine of $300 (§ 1202.45), court security fees (§ 1465.8, subd. (a)(1)), and a criminal conviction assessment (Gov. Code, § 70373).

Murphy argues the court's imposition of the fines and fees without a determination that he had an ability to pay violated due process, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164. *Dueñas*, decided in January 2019, held that due process of law requires a trial court to determine a defendant's present ability to pay before imposing court facilities and court operations assessments or a restitution fine. (*Id.* at pp. 1164, 1172.)

Although Murphy's February 8, 2022 sentencing hearing was more than three years after the *Dueñas* decision, he did not object to the imposed costs. This typically forfeits the right to challenge the fines and fees on appeal. (*People v. Aguilar*

23

(2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 856–859; *People v. McCullough* (2013) 56 Cal.4th 589, 597–598.)  Applying this general rule, we conclude Murphy forfeited the issue.  (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

## DISPOSITION

We affirm the judgment.


EGERTON, J.

We concur:


EDMON, P. J.


LAVIN, J.

24